(83 South. 821)

(No. 22025.)

SOUTHERN COTTON OIL CO. v. NEW ORLEANS & N. E. R. CO.

(Feb. 2, 1920.)

*(Syllabus by Editorial Staff.)*

1. CARRIERS ☞134—VALVES AND OUTLET CAP IN OIL TANK CAR IMPROPERLY ADJUSTED BY SHIPPER.

    Conflicting evidence *held* to establish that the shipper of an oil tank car did not properly adjust a valve and outlet cap so as to reasonably obviate the leakage of oil during transit.

2. CARRIERS ☞122—RAILROAD LIABLE FOR NEGLIGENCE ALTHOUGH SHIPPER WAS ALSO NEGLIGENT.

    Under Rev. Civ. Code, § 2754, making carriers liable for loss and damage unless occasioned by accidental or uncontrollable events, the fact that a valve and outlet cap on an oil tank car were improperly adjusted by the shipper will not relieve the carrier from liability if its negligence, after discovery of the leakage of oil, contributed to the loss.

3. CARRIERS ☞134—RAILROAD LIABLE FOR NOT STOPPING LEAKAGE IN OIL TANK CAR.

    Evidence that a ralroad train crew failed to stop the leakage from an oil tank car, although it might easily have been done by unscrewing a dome cap on top of the tank and adjusting the valve, *held* to establish the railroad's negligence, especially as one of the crew had previously seen such an adjustment made.

    Provosty, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by the Southern Cotton Oil Company against the New Orleans & Northeastern Railroad Company. Judgment for defendant, and plaintiff appeals. Reversed, and judgment ordered for plaintiff.

Miller, Miller & Fletchinger, of New Orleans, for appellant.

Hall, Monroe & Lemann, of New Orleans, for appellee.

In this case, his honor, Mr. Chief Justice MONROE, being recused and their honors being evenly divided in opinion as to the proper determination to be made of the issues involved, Judge MAX DINKELSPIEL, of the Court of Appeal for the parish of Orleans, having been called upon by previous order of this court to sit in the case, pronounced the judgment of the court therein, in words and figures, as follows, to wit:

On October 11, 1913, plaintiff, the Southern Cotton Oil Company, entered into a written contract with the Southern Oil & Fertilizer Company of Meridian, Miss., to purchase from them a tank car of prime crude cotton seed oil, which contract was carried into effect, and cotton seed oil to the value of $3,594.70 was purchased. On October 22, 1913, this oil was loaded into tank car S. C. O. X. 301, by the employés of the oil company, at Meridian, Miss., and by them on that day, as shown by the bill of lading issued by defendant company, turned over to

the railroad company, to be shipped by them over their line to Gretna, La.

By admissions which we find in the record (page 40) a tank car in which this oil was shipped was delivered to plaintiff at Gretna entirely empty, and this suit was brought to recover the value of the oil lost in transit.

Defendant alleges in its answer that the tank car in question was the property of plaintiff, that the contents escaped from the tank in which it was loaded by the employés of the oil company without fault or responsibility of defendant, and alleged that the loss was due to defects in the equipment of the car in which the oil had been shipped.

Defendant further alleges that plaintiff failed to properly close the valve inside the tank, or that the valve was defective and worked open, thus permitting the contents of the car to escape, and that the shipper was further negligent in not properly screwing on the cap, attached to an outlet pipe at the bottom of the car, which cap afforded an additional protection to its contents, and claims that, had the plaintiffs exercised due care in loading this car, the accident would not have occurred, and there would have been no loss of oil.

There was according to the evidence 8,240 gallons of fine crude cotton seed oil purchased and loaded in said car, for which a bill of lading, dated October 22, 1913, was issued by defendant company, and on that date the car was taken possession of by defendant and formed part of the train leaving Meridian on October 25, 1913, in charge of defendant's employés.

The record further shows that after the train had traveled 36 miles, taking about two hours for that journey, the conductor in charge discovered that oil was escaping from the tank car, and immediately signaled the engineer, stopping the train just outside of Vossburg, a railroad station on that line, and that an examination of the car showed that the oil was leaking from an outlet pipe, about five inches in diameter, and which pipe protruded slightly from underneath the body of the tank car, and which has a cap attached to a chain, which cap is made to screw onto the outlet pipe, and when tightly screwed on will aid to hold back the oil in the tank, but unless same is tightly screwed on it is liable to work off, either through the jolting of the train whilst in motion or for some other cause. The interior of the car is fitted with a valve, adjusted from the top by a handle, which handle is manipulated through the dome of the car. It is shown further that if this valve is tightly set in its proper place, it is impossible for any oil to escape, whether the cap underneath the car be screwed on or not. The dome at the top of the car is also fitted with a cap which screws onto it, and after these cars are loaded this cap is also screwed tightly in its place by the parties loading them.

When this train was stopped and the tank examined, it was found that the cap underneath the car had worked off, was hanging by its chain, and the oil escaping in a thick stream through the outlet pipe.

An attempt was made by the train crew to check the flow of oil by replacing the cap on this outlet pipe and by means of a plank with which they endeavored also to check the escape of the oil, but the flow was too strong underneath the car, whereupon the engineer climbed on top of the car and attempted to open the dome cap in order to close the valve, but in this he was as unsuccessful as he and the balance of the crew had been underneath the car.

It is also shown that any one at all familiar with the methods of opening up this dome cap could have done so in a few minutes, and by adjusting the valve have saved a very large quantity of the oil. Finding themselves unable to check or prevent the escape of this

545 SOUTHERN COTTON OIL CO. v. NEW ORLEANS & N. E. R. CO. 546

oil, after working about three-quarters of an hour, this tank car was cut out of the train and left on a side track at Vossburg, and a report by the conductor was made to the superintendent.

The record also shows that after the car had been loaded at the mill at Meridian by the employés of the oil company, and had been turned over by them to the railroad company, it was properly looked after and protected by the employés of defendant company during the time it was in its care and up to the time the leak was discovered.

[1] While it is true that Brown, the superintendent of the oil company at Meridian, and his negro assistant have testified that in their opinion the oil was properly loaded by them in this tank and the valve was set and the cap underneath the car was tightly screwed on, we are of the opinion that this testimony is not of such a character as to make it absolutely certain that this was the case. On the contrary, we believe that both of these men, who attended to the loading of the oil into this tank car, were careless at the time of loading, and did not make absolutely certain that the valve inside the car was tightly set, nor is it our opinion that same was so set, or that the outlet cap was tightly screwed on when this tank car was delivered to the railroad company, and therefore we believe that after the train, of which this tank car formed a part, had been on its journey for some time, and after same had left Barnette, the jolting of the train caused the outlet cap to work off, and, the inside valve not having been properly set when the car was loaded, the oil escaped through the outlet pipe.

[2] Having, however, reached the conclusion that the tank car at issue was not loaded with that care which would preclude the idea that the valve was properly set when same was turned over to defendant company, the question then presents itself whether or

not, after the leak was discovered by the conductor of the train, of which this tank car formed a part, did defendants do all in its power and use that care which as a common carrier it is compelled to exercise in order to stop the flow of oil and thereby prevent the waste of the valuable freight, of which at that time it had entire control and supervision, so as to relieve it of all liability.

This point, as well as all others, has been ably argued, both orally and in briefs filed by counsel for plaintiffs and defendant, but a careful examination of the many authorities relied upon by counsel for defendant does not convince us that, even though the goods were improperly packed by the consignors and delivered to the railroad company in that condition, that fact alone will relieve them from liability as common carriers if after discovering the leakage the carrier's negligence was of such a character as to have contributed to the damage compained of.

The law in this connection has been frequently expressed, and we quote from Corpus Juris, vol. 10, p. 125:

"Where the carrier relies on one of the exceptions to his common-law liability, it must appear, in order to excuse him, that the exceptional cause, such as an act of God, or the like, was the immediate or proximate, and not the remote, cause of the loss. And whilst it must be true as a general proposition that, although the carrier is in some way negligent, if such negligence does not contribute to the loss which is due to an excepted cause the carrier is not liable, it is very generally declared that, if the negligence of the carrier concurs with an act of God in producing a loss or injury, the carrier is not exempt from liability by showing that the immediate cause was the act of God, or other excepted cause. A carrier is responsible where a loss is caused by act of God or excepted cause if the carrier's negligence mingles with it as an active and co-operative cause."

"It is clear that if the carrier might by reasonable care or foresight have avoided loss by act of God or other excepted cause he will be liable. The duty also rests upon him, as far

as possible, to avoid or lessen the damage resulting from such cause, and negligence in not doing so will render him liable." 6 Cyc. 384. Union Express Co. v. Graham, 26 Ohio St. 595; Gulf Coast Transfer Co. v. Howell et al., 70 Fla. 544, 70 South. 567, L. R. A. 1916D, 974; Jonesboro, L. G. & E. R. Co. v. Dunavant, 117 Ark. 451, 174 S. W. 1187.

This question is not a new one in this state, the liability of carriers having been fixed by our Code and determined by this court. R. C. C. art. 2754; National Rice Milling Co. v. N. O. & N. E. R. R. Co., 132 La. 615, 61 South. 708, Ann. Cas. 1914D, 1099; Lehman Stern & Co. v. M. L. & T. R. R. & S. S. Co., 115 La. 1, 38 South. 873, 70 L. R. A. 562, 112 Am. St. Rep. 259, 5 Ann. Cas. 818; Darrall v. S. P. Co., 47 La. 1456, 17 South. 884. We do not think that the rule set out in Sedgwick on Damages (9th Ed.) p. 415, quoted in the second supplemental memorandum by counsel for the railroad company, has any force or application in so far as this case is concerned.

[3] A careful study of the testimony in this case as shown by the record fails to convince us that at the time the leak was discovered by the employés of the defendant company it required any special degree of skill on their part to have unscrewed the dome cap at the top of this car, and, having done so, to set the valve in a very few minutes, thereby saving all the oil which was in the tank.

The conductor of the train testified that the tank car was in apparent good condition until after the train left Barnette, and up to that time he had discovered no traces of any oil escaping from the outlet pipe, and it was not until the train was nearing the Vossburg railroad station that from a pungent odor which pervaded the caboose, in which he was then seated, he came to the conclusion that oil was escaping, and on looking out of the caboose he found traces of oil upon the railroad tracks. He then signaled the engineer to bring the train to a stop, which was done within three minutes of the time when he made the discovery that the oil was leaking, the train then being close to the Vossburg station. That in company with the engineer and other members of the train crew, with the exception of the fireman, who was left in charge of the engine, they ascertained the cause of the leak, and endeavored to stop same, first by attempting to screw on the cap of the outlet pipe underneath the car, by trying to affix a plank to the bottom of that pipe, and, being unsuccessful in these attempts, then attempted to unscrew the dome cap on top of the car and set the valve inside of same.

An examination of the model of the tank car, placed in evidence by defendant company, taken in connection with the testimony of the various witnesses who testified as to the method of unscrewing this dome cap and setting the valve, does not convince us that the crew of this train, amongst whom was an experienced engineer and mechanic, took the proper steps to stop this flow of oil, particularly as it appears to us that even a casual examination of the car would have shown them what ought to have been done in this connection.

It seems that if the engineer of the train, who stated that after mounting on top of the car he endeavored to unscrew the dome cap by applying an 18-inch monkey-wrench to one of the lugs permanently attached and forming part of that cap, and in that way endeavored to unscrew same, had examined the cap in question, it must have been apparent to him that that was not the proper method to follow, and, as shown by the evidence, there was in his possession, as part of the tools carried on this train, an iron pick; that by inserting the handle of this pick between the lugs on the dome cap, and, by the exertion of very little force in the right direction, have unscrewed this dome cap and set the valve, thereby saving the oil remaining in the tank.

Even if the engineer, who had been for a great many years in the employ of this railroad company in that capacity, and who must have been a trained mechanic (and therefore in our opinion ought to have known how to unscrew a cap of this character), did not possess that knowledge, there was a member of the crew present at the time of the accident who by his own testimony shows that he had seen a car of this character opened, and had looked inside of same (record, page 116) and therefore knew, or most certainly ought to have known, what to do in this emergency. Yet this man stands by, and not only makes no attempt himself to unscrew the dome cap in the way he had seen it done, but offers no suggestion to the engineer during the entire time that he and the other members of the crew were attempting to do what ought to have appealed to this servant of the railroad company as a vain thing in stopping the flow of this oil.

In the face of this testimony, we cannot hold that the officials of this company (the railroad), whose duty it was to have prevented the waste of this valuable freight intrusted to its care as soon as the leak was discovered by them, and which in our opinion required the exercise of no special skill on their part to have accomplished, particularly when we take into consideration the fact that the car in question was solely in defendant's custody and supervision at the time the leak was discovered, had a right to cut this car out of the train, side-track it, and allow its entire contents to leak away, relying solely on the fact that the car in question was the property of the consignors and had been badly loaded by them, thereby escaping liability of what in our opinion was defendant's negligence and want of care, and which negligence was the proximate cause of the damage suffered by the plaintiffs in this case.

For the reasons herein assigned it is ordered, adjudged, and decreed that the judgment of the lower court be now avoided, annulled, and reversed, and that there be judgment in favor of plaintiffs, the Southern Cotton Oil Company, and against the defendants, the New Orleans & Northeastern Railroad Company, in the sum of $3,594.70, with legal interest thereon from the 15th day of October, 1913, until paid, defendants to pay costs of both courts.

Judgment reversed.

See dissenting opinion of PROVOSTY, J., 83 South. 824.