# TENNESSEE PACKERS, INC., v. TENNESSEE CENTRAL RAILWAY COMPANY, and CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RAILWAY COMPANY. —319 S. W. (2d) 502.

Middle Section. April 25, 1958.

Rehearing denied July 3, 1958.

Certiorari denied by Supreme Court December 12, 1958.

58 

Maclin P. Davis, Jr., James C. Kirby, Jr., Nashville, for plaintiff in error.

Ferris C. Bailey, Bailey, Ewing, Davies & Bailey, Nashville, for Cincinnati, New Orleans, & Texas Pac. R. Co.

John D. Whalley, Martin & Cochran, Nashville, for Tenn. Cent. R. Co.

## I

SHRIVER, J. Plaintiff's action herein was for damages for the value of a large quantity of tallow which was lost while being transported by the defendants on their lines from Clarksville, Tennessee, to Ivorydale, Ohio.

The case was tried before a jury and resulted in a directed verdict for the defendants. After defendants' motion for a new trial was overruled the cause was appealed in error to this Court.

Plaintiff's declaration was in three counts, the first of which was based on negligence, the second on breach of contract, and the third on the statutory right of

recovery against railroads provided in title 49 U. S. C. A. sec. 20, par. (11).

It was alleged that on May 27, 1954, plaintiff delivered to the Tennessee Central Ry. Company at Clarksville, Tennessee, 60,000 pounds of tallow to be transported to plaintiff's consignee, at Ivorydale, Ohio, on a through bill of lading; that Tennessee Central transported this cargo on its lines to Winfield, Tennessee, where it was delivered to the defendant C. N. O. & T. P. Railroad for further transportation to its destination; that on or about May 28, 1954, while the shipment was on the lines of the defendants, 33,520 pounds of the tallow was lost; that within a few days the defendants were notified of the loss and a written claim was filed for same but defendants refused to pay it.

The declaration, as later amended, sought a recovery of $3,000 from the defendants which included the value of the lost tallow and interest.

The defendants filed pleas of not guilty but subsequently filed special pleas denying that they were guilty of negligence and asserting that the loss of the tallow resulted from the negligence of the plaintiff's employees in improperly loading the cargo.

Replications were filed to the special pleas and the case was tried with the result hereinabove mentioned.

## II

### Assignments of Error

The two assignments of error raise the single question whether the trial Judge was in error in directing a verdict for the defendants, it being asserted that there was

material evidence to take the case to the jury as to both defendants.

## III

On May 27, 1954, plaintiff's employees loaded 60,000 pounds of tallow into a tank car on its siding in Clarksville. The car belonged to the General American Transportation Corporation. The tank was loaded through the dome at the top and was equipped with a valve at the bottom of the tank for the purpose of unloading the cargo. At the dome in the top of the tank is a bracket attached to a rod which extends down through the tank to this valve and operates to open and close same by use of the handle or bracket in the dome. To the opening in the bottom of the tank is attached an outlet pipe which is threaded at the outer end and is used in unloading the tank by screwing a hose or another pipe onto it. There is also a cap which screws on the end of the outlet pipe to protect the threads and to prevent leakage from the tank if the valve should open in transit. It is attached to a chain which prevents its loss when unscrewed from the outlet pipe.

After the car was loaded with tallow the Tennessee Central accepted it and issued a through bill of lading for shipment to the consignee, Procter and Gamble, at Ivorydale, Ohio. The bill of lading showed that the car was received in good order. The said railroad then took the car on its line from Clarksville to Nashville, a distance of 56 miles, where it was weighed and found to contain 60,000 pounds of tallow. The Tennessee Central, then shipped the car on its line to Emory Gap, Tennessee, a distance of 163 miles where it was inspected on the afternoon of May 29, 1954, by representatives of both

Tennessee Central and the C. N. O. & T. P. and found to be in good order. The cap was on and there was no evidence of any leakage. On May 30, 1954, the day after the first inspection, the C. N. O. & T. P. made another inspection and accepted the car for transportation to its destination.

After the car was taken over by the latter railroad and had proceeded about 52 miles, a brakeman and conductor riding in the caboose smelled an odor and saw some oil spots on the tracks. They looked in the train book and saw they had a car of tallow. At this time the tallow was spilling out only slightly but the leakage increased as the train went along.

The train travelled six miles farther after the discovery of the leakage and stopped at Pine Knot, Ky., at which time the tallow was pouring out in a large stream. The valve, apparently, had opened more widely as the train went along. The brakeman and conductor went to the car after the train stopped and saw that the cap on the outlet pipe at the bottom of the tank was off. One of the brakemen climbed up on top of the car and closed the valve with his hands and this stopped the leakage. A trainman then screwed the cap on the outlet pipe at the bottom of the car without the use of a wrench and the train then continued on its way with no further leakage. The record shows that a total of 33,520 pounds of tallow was lost and it is stipulated that the value of the lost tallow was $2,388.30.

There was testimony to the effect that the train could have been stopped within one half mile after the leakage was first noticed, but it travelled six miles before stopping.

Mr. Sanders, an experienced brakeman of the C. N. O. & T. P., testified that the fact that the leakage started out very slowly but gradually increased, indicated that, as the car was travelling along, the valve was opening wider and wider.

It seems evident that there was no leakage until the cap on the outlet pipe came off.

Plaintiff submitted a claim to the Tennessee Central for the value of the lost tallow but it was rejected by the claim agent who stated in a letter (Exhibit 2, Rosson) that the loss was due to "bolts loose at splice plates." It was later admitted that the loss was not due to loose bolts at the splice plates but was due to the outlet valve having opened and the cap on the outlet pipe having come loose.

A stipulation was read into the record (p. 12) which is as follows:

"The tank car into which the plaintiff's employees loaded its tallow at Clarksville, Tennessee, was owned and maintained by the General American Transportation Corporation. At all times material to this action this car and its operating mechanisms were in proper operating condition. Neither of the defendants had any supervision or control over the loading of said car, nor did they participate in said operation.

"2. The tank car was transported by the defendant, Tennessee Central Railway Company from Clarksville, Tennessee, to Nashville, Tennessee, on May 27, 1954, where it was weighed and found to contain 60,000 pounds of tallow. Said defendant

further transported said tank car to Emory Gap, Tennessee, where it was delivered to the defendant, Cincinnati, New Orleans & Texas Pacific Railway Company, for further transportation. At the time of this delivery said car was inspected and taken without exception by the defendant, Cincinnati, New Orleans & Texas Pacific Railway Company. While said car was being transported tallow weighing approximately 33,520 pounds leaked out. The value of the tallow which leaked out was $2,388.30.

"3. At the time and on the occasion of the loading of the tank car in question there was in full force and effect, and binding on the plaintiff, Uniform Freight Classification No. 2, I.C.C. A-2, of which Rule 35, Section 9 provides as follows:

" 'Rules for Preparation of Tank Cars for Loading. Section 9. Before tank cars are loaded, the shipper must examine the tanks and appurtenances to see that the outlet valves are in proper condition. Outlet valves must be closed. Tanks with bottom discharge outlets must have outlet caps off during the entire time tanks are being loaded. When loading has been completed, all closures of opening in tank cars and their protective housings must be properly secured in place by use of a bar, wrench or other suitable tool.'

"4. The tank car was accepted and transported by the defendants under the terms and conditions of a through bill-of-lading, a copy of which is attached hereto and made a part hereof."

John Shaw, who loaded the car for the plaintiff, testified that he had worked for plaintiff for several years. He stated that, in loading this car, he first went up on top to set the valve. When asked how he set it, he said, "I used a wheel to turn it". He stated that the wheel was up in the dome and that he screwed the valve down tightly. He then went down to the bottom and put the safety plug on. And when asked what the safety plug was, he stated, "A safety plug is a cap that comes down the bottom of the car where the grease runs out and fits over the outlet pipe."

He testified positively that the valve was closed on this car before he started loading the tallow into it. He stated that he looked around to see if there were any leaks but that the car was OK and that he used a pipe wrench to tighten the cap on the outlet pipe. When asked "Did you turn it as tight as you can?", he said "Yes, sir."

He was then asked, "John, the valve and caps were both closed as tight as you could get them when you loaded that car?" He answered, "That is right."

At the time of the loading, the tallow was heated to 140 degrees and was in liquid form. When it cools off it gets thicker. There was no leakage from the car during the period of loading, and after picking the car up at Clarksville, the Tennessee Central discovered no leakage up to the time it turned the car over to the connecting carrier.

The evidence is that there was no leakage until after the car had travelled approximately 271 miles from Clarksville, Tenn.

## IV

## The Law

■ In American Lead Pencil v. Nashville, C. & St. L. Ry., 124 Tenn. 57, 134 S. W. 613, 32 L. R. A., N. S., 323, it was held that a common carrier is not liable for a loss caused by the shipper's act, whether that act be one of negligence, misadventure, or misfortune.

And this same language was repeated in Model Mill Co. v. Carolina, C. & O. Railway Co., 136 Tenn. 211, 188 S. W. 936.

Applying this rule to the case at bar, of course the question arises as to whether, as a matter of law, the loss of the tallow must be held to have resulted from an act of the shipper.

As is seen hereinabove, the stipulation entered into by the parties shows that the shipper in this instance did not observe one of the rules for preparation of tank cars for loading. The rules provide that the shipper must examine the tank and appurtenances to see that the outlet valves are in proper condition. This rule was observed. The rules provide that the outlet valves must be closed, and plaintiff's witness testified that this was done. But the rules also provide that tanks with bottom discharge outlets must have the outlet caps off during the entire time the tanks are being loaded. It is conceded that plaintiff's servant did not observe this part of the rule. The rules further provide that when the loading has been completed, all closures of openings in the tank cars and their protective housings must be properly secured in place by the use of a bar, wrench, or other suitable tool. Plaintiff's witness testified that this was done.

It is apparent that the reasons for the rule with respect to removing the cap from the discharge pipe at the bottom of the car during the loading is in order that one can readily observe if the discharge valve, which fastens from the lever or wheel at the top of the car, is properly seated. This procedure is discussed in Alabama & V. Ry. Co. v. American Cotton Oil Co., 5 Cir., 249 F. 308.

In Fort Smith Cotton Oil Co. v. Swift & Co., 197 Ark. 594, 124 S. W. (2d) 1, the Supreme Court of Arkansas said that there was evidence to the effect that the outlet pipe cap is not intended to hold the lading but is intended to protect the threads on the pipe to which is attached another instrumentality in unloading. Also that these caps often come loose and drop off the outlet pipe caused by the vibration of running freight trains.

In that case the Court said that the inspections made by the railroad consisted of flashing a light on the dome cap to see if it was screwed down and on the outlet pipe to see that the cap was on and that there was no leak. And that no duty rested on the railway company to make a more minute inspection, that is, it was not required to go on top of the tank and remove the dome cap to see if the valve was properly seated.

The Court also pointed out that witnesses for the appellant testified that the car was properly loaded and that the valve was properly seated and the dome and outlet caps properly screwed down and that, under these facts, a question was undoubtedly made for the jury as to whether appellants or the railway company was at fault and, therefore, a verdict for the shipper should be sustained.

Lever Brothers Co. v. Baltimore & Ohio Railway Co., 4 Cir., 164 F. (2d) 738, 739, is a case wherein the facts are very similar to those in case at bar. In that case a car was placed by the plaintiff on the consignor's siding at Wilmington, Del., where it was loaded with tallow which was pumped into the car as hot liquid. The tank and its openings were described as corresponding exactly with those in the case at bar. After the car was loaded it remained in the custody of the carrier for five days near Wilmington without leakage. It was then hauled to Baltimore and when it reached a point 10 or 11 miles from that city, the conductor of the train noticed a streak of grease on the ties and it was discovered that the tallow was running out at full force from the outlet pipe and substantially all of it was lost. The outlet cap was missing. The Court said:

"These circumstances made out a prima facie case of negligence on the part of the carrier and placed the burden upon it to show that it was not responsible for the loss. To meet this burden the carrier showed that there had been no rough handling of the car and no accident. It also introduced evidence of an examination of the car on the day that the tallow was lost when it was discovered that the outlet valve could not be closed." It was found that "a piece of wood 2 x 4 x 15 inches" was wedged in the valve and it "was also found that the valve handle and the valve rod were stuck and that nuts on the rod were out of adjustment."

Under these circumstances it was held by the Court that the evidence showed that the cause of the loss was the failure of the valve to be closed, which was a hidden defect that was not observable to the railroad company

or its agents, and, therefore, the carrier was absolved of responsibility for the loss.

As contrasted with the case at bar, it is stipulated herein that, at all times material to this action, this car and its operating mechanisms were in proper operating condition.

Thus, even if it could be said that the failure of plaintiff's employee to leave the outlet cap off during the loading constituted negligence, nevertheless, the question would still remain as to whether such negligent act proximately caused or contributed to the loss of the tallow.

In view of the stipulation that the mechanisms were in proper operating condition, and in view of the testimony of plaintiff's witness who loaded this car that he closed the valve as tight as it could be closed by using the proper method to do so, and then that he tightened the cap on the outlet pipe with a wrench as tight as he could close it, we think that the question is one for the jury as to whether or not his failure to leave the outlet cap off during the loading operation was the proximate cause of the loss in question. This is especially true in view of the fact that the car proceeded for several days, and more than 200 miles toward its destination before any leakage occurred, and then when the leakage was discovered, all that was required in order to correct same was that a brakeman climb up on top of the car and tighten the valve with his hands by operating the wheel at the top of the valve rod. The cap on the outlet pipe was then screwed on by hand and the car proceeded to its destination without any further loss.

This would strongly indicate that there was no foreign body lodged in the valve when it was closed, and that, in accordance with the stipulation, it was in proper working order.

Thus, since the burden is on the carrier to show that the cause of the loss was the negligence of the shipper who loaded the car, we think that there is room for reasonable men to differ in their conclusions from these facts as to whether negligence of the shipper in loading this car was the proximate cause of the loss.

In 9 Am. Jur. 842, the rule is stated as follows:

"In the majority of jurisdictions, however, the carrier is required to go further and bring itself not only prima facie but completely within such exemption or exception by establishing, by a preponderance of the evidence, the absence of any contributing fault or negligence on its part."

The Tennessee Central offered no evidence as to the treatment or method of handling the car while in its possession.

In American Cotton Oil Company v. Davis, 129 Wash. 24, 224 P. 23, the Supreme Court of Washington discussed the rule that improper loading ordinarily constitutes such a fault on the part of the shipper as will relieve the common carrier from its common law liability for the safe delivery of goods, especially where the faulty loading consists of internal defects of which the carrier does not know. It pointed out, however, that the burden of this defense is on the carrier and, since it did not own or furnish the car, it became necessary to prove what the

defect was and what the condition of the valve, as discovered by inspection after the loss, was, and the reasons for its condition.

In the case of Tennessee Railway Co. v. Riddle Coal Co., 1 Tenn. App. 129, it was held as follows:

"In an action by coal company against railroad for loss of coal by loosening of hopper bottom of car, the burden is on the railroad to show that the loss was the result of shipper's loading and not caused by negligence of carrier."

"The loss occurring while the car was being hauled by the defendant, we think that the only question presented by the record is; was there any material evidence that plaintiff had properly loaded and fastened the bottom of the car.

"We think that the testimony of the witness Terry coupled with the fact that the defendant hauled the car three miles before the bottom came loose is sufficient to justify us in holding that there was some material evidence to support the finding of the trial Court, that the plaintiff had properly loaded the car and fastened its bottom * * ."

In a leading case on the subject, to wit, Merchants' Dispatch Transportation Company v. Bloch Brothers, 86 Tenn. 392, it was said, at page 416, 6 S. W. 881, at page 889:

"There is no positive proof that the loss resulted from the negligence of any one. But such proof is not necessary to entitle plaintiffs to a recovery; for 'where goods in the custody of a common carrier are

lost or damaged, the presumption of law is that it was occasioned by his default, and the burden is upon him to prove that it arose from a cause for which he was not responsible.' "

■ Thus, *where the mechanism of the valve was in proper operating condition,* and there is creditable testimony to the effect that the valve was closed by the shipper as tightly as could be, and that the outlet cap was screwed on and tightened with a wrench and no loss occurred thereafter until the car had been transported 271 miles; and where, after the loss occurred, the valve was readily seated by a simple manual operation, we believe, as hereinabove indicated, that there is a question for the jury as to whether the action of the shipper's agent in loading the car was a proximate cause of the loss, the burden being on the railroad to show that such was the case.

■■ There is another question that seems, necessarily, to involve a jury issue, that is, whether or not the employees of the C. N. O. & T. P. Railroad, after discovering the leakage, did all that they reasonably could to stop same and avoid or mitigate the loss.

In other words, there is proof to the effect that when the employees of the railroad first noticed the leakage it was very slight and that they could have safely stopped the train in one half mile, whereas, they ran on for six miles before stopping, at which time the tallow was pouring out in a large stream. After stopping, all that was necessary in order to prevent further loss was to close the valve which took only a few moments. The cap was then screwed on the outlet pipe and there was no further loss,

As to whether or not the employees of the railroad stopped the train as soon as they should have we think is a question of fact for the jury.

In Southern Cotton Oil Co. v. New Orleans & N. E. R. Co., 146 La. 541, 83 So. 821, the shipper had failed to properly close the valve of a tank car which had been loaded with cotton seed oil. The Court held that the improper loading would not relieve the carrier from liability for leakage of the oil if, after discovering it, the carrier was negligent in failing to set the valve and save the oil.

Again, in 9 Am. Jur. at page 867, Sec. 731, it is said that if negligence on the part of the carrier proximately contributes to the loss or injury, the fact that the goods were improperly loaded is not available as a defense, even though it may have been a contributing factor, and that the carrier cannot evade liability in such case on the theory that such fault on the part of the shipper constituted contributory negligence.

Also, in Merchants' Transfer Co. v. Kiser, 179 Ky. 324, 200 S. W. 454, L. R. A. 1918C, 658, it was held that a carrier was liable for loss of goods of a customer by a fire originating in an explosion of a fire-arm packed in the goods, if, by the exercise of ordinary care after discovering the fire, the carrier might have extinguished it and saved the goods.

And finally, in 9 Am. Jur. 942, Sec. 836, it is said that a carrier having the full custody of the property which it has accepted for transportation, but which is not delivered at its destination, has the burden of excusing the nondelivery and, in the absence of evidence as to how the loss occurred, a presumption arises that it resulted

from its negligence. And it is said, "This rule is applicable in an action against the initial carrier under the Interstate Commerce Act for a loss or injury occurring on the line of a connecting carrier."

█ Taking the strongest legitimate view of the evidence in favor of the plaintiff and allowing all reasonable inferences from the proof in its behalf, as we are bound to do, we think there is material evidence which should have been submitted to the jury. See Poole v. First National Bank of Smyrna, 29 Tenn. App. 327, 196 S. W. (2d) 563 and cases cited therein.

It results that the assignments of error are sustained, the judgment of the trial Court is reversed and the cause remanded for a new trial.

Reversed and remanded.

Felts, J., and Avery, P. J., (Western Section), concur.

## On Petitions to Rehear

SHRIVER, J. Both the defendants in error have filed petitions to rehear.

We think that an examination of our opinion heretofore filed will clearly indicate that every question raised in each of the petitions to rehear was fully considered by this Court.

We think there was a jury question as to whether or not the alleged improper method of loading of the car by the shipper was the proximate cause of the loss. It is to be remembered that this car was hauled for three days, a distance of 271 miles without leakage. The proof shows that the valve and outlet cap were closed as tight as they reasonably could have been when the car was loaded and

that the bill of lading issued by the Tennessee Central Railway acknowledged that the car was received in apparent good order. Such inspection as the T. C. employees gave the car after it had traveled 219 miles and was turned over to the defendant C. N. O. & T. P. Ry. indicated that it was still in apparent good order. Nevertheless, the valve did become opened and the outlet cap came off and the tallow spilled out of the car.

It is the position of defendants that the failure of the plaintiff to leave the outlet cap off while the car was being loaded must be considered as the proximate cause of the loss. With this we cannot agree, particularly, in view of the fact that it was stipulated that all mechanisms of the car were in proper condition and in good working order at the time the load was received by the carrier. It seems obvious that the purpose of leaving the cap off during the loading is to determine whether or not the valve is in proper working condition at the time and, since it is stipulated that it was in proper working condition, it would seem that the failure to leave off the cap during loading might be considered by reasonable men to have been innocuous and of no material consequence. At least such a conclusion is reasonable.

In any event, there was certainly a question for the jury as to the liability of the C. N. O. & T. P. Ry. Co. on the issue of whether or not its servants were negligent in allowing the train to travel six miles after the leak was first discovered before it was stopped, when the proof showed that it might have been stopped in a much less distance. As pointed out in the original opinion, all that was required to correct the condition was to manually operate the valve to prevent further loss, which is also significant.

As to the petition of the Tennessee Central Railway Co. we feel that counsel have overlooked the force and effect of the Carmack amendment, it being the position of Tennessee Central that there was no reason for holding it liable since the carrier on whose lines the loss occurred was before the Court.

We point out again that, as was held in Atlantic Coastline R. R. Co. v. Riverside Mills, 219 U.S. 186, 31 S. Ct. 164, 55 L. Ed. 167, the undisputed effect of the Carmack amendment is to hold the initial carrier who is engaged in interstate commerce by receiving property for transport from a point in one state to a point in another state, as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents.

In case of loss the shipper is not required to search out the guilty carrier over whose line his goods were shipped in order to maintain his suit and have a recovery. Under the Carmack amendment he may sue the initial carrier where, as in this case, it contracted to deliver the cargo to its destination in another state, using a connecting carrier.

Another fact that counsel for the Tennessee Central seems to have overlooked is that, where there is a loss by a carrier, as in this case, there is a presumption of negligence on the part of the Railroad and this presumption must be overcome by proof.

In this record there is no evidence as to how the car was handled while in the possession of the Tennessee Central. It is possible that rough handling of the car or tampering with the outlet valve and its controls by someone unauthorized to do so may have loosened said valve

while in possession of the Tennessee Central Ry. There was proof that the valve was closed tight before it was turned over to the initial carrier. As to whether it was still tight when it reached the other defendant carrier we do not know because the valve may have been loosened and still the outlet cap remaining on would have prevented the loss of tallow until the outlet cap was jostled loose by the vibration of the car.

Considering the presumption of negligence and the effect of the Carmack amendment, together with all the other facts and circumstances in this cause, and especially the fact that the petitions to rehear do not raise any questions which we have not already considered, the petitions are denied.

Petition denied.

Felts and Hickerson, JJ., concur.