135 So.2d 481 (1961)
SOUTHWESTERN SUGAR & MOLASSES COMPANY
v.
INDUSTRIAL MOLASSES CORPORATION, D/B/A Manard Molasses Company, Godchaux Sugars, Inc. and Texas & New Orleans Railroad Company.
No. 117.
Court of Appeal of Louisiana, Fourth Circuit.
December 4, 1961.
Rehearing Denied January 2, 1962.
*482 Deutsch, Kerrigan & Stiles and Joaquin Campoy, New Orleans, for plaintiff and appellant.
Phelps, Dunbar, Marks, Claverie & Sims and John G. Weinmann, New Orleans, for Industrial Molasses Co., d/b/a Manard Molasses Co., defendant and appellee.
Milling, Saal, Saunders, Benson & Woodward and H. H. Hillyer, Jr., New Orleans, for Godchaux Sugars, Inc., defendant and appellee.
Chaffe, McCall, Phillips, Burke & Hopkins, Harry McCall, Jr., New Orleans, for Texas & N. O. R. Co., defendant and appellant.
Before McBRIDE, REGAN and JOHNSON, JJ.
McBRIDE, Judge.
On or about March 13, 1951, Southwestern Sugar & Molasses Company (hereinafter referred to as "Southwestern") purchased from Industrial Molasses Corporation, doing business as Manard Molasses Company (hereinafter referred to as "Industrial"), fifteen tank car loads of blackstrap molasses, to be shipped by Industrial from Raceland, Louisiana, to plaintiff's plant at Houston, Texas.
About April 4, 1951, pursuant to the aforementioned purchase agreement, Industrial caused to be loaded by Godchaux Sugars, Inc. (now named Gulf States Land & Industries, Inc.hereinafter referred to as "Godchaux"), at its refinery at Raceland, Louisiana, 8,084 gallons of molasses into tank car GATX 15,057, which said tank car when loaded was on April 5, 1951, delivered at Raceland to and taken possession of by Texas & New Orleans Railroad Company (hereinafter called "Railroad") for carriage to Southwestern at Houston, Texas, under a "Shipper's Load and Count" bill of lading. Title to the molasses passed to Southwestern at Raceland. A substantial portion of the contents of tank car GATX 15,057 was lost en route, and this suit is brought by Southwestern to recover the value thereof and also for a refund of proportionate freight charges paid on the undelivered molasses, aggregating $2,916.13. Impleaded as defendants, in solido, are Industrial, Godchaux, and the Railroad. The carrier is sought to be held liable because of an alleged failure to properly inspect the car during transit, failure to timely discover the escape of the molasses, and failure to take steps to prevent same. The liability of the other two defendants is grounded on their alleged failure to properly load the molasses. The Railroad answered denying liability and averring that it handled the tank car in accordance with standards of reasonable care, general practice, instructions of the lessor of the car and detailed instructions of the shipper. After filing ineffectual exceptions, the other defendants answered denying negligence or any improper loading, both setting up specially that the loss was caused because plaintiff furnished a tank car with a defective inner valve, which condition could not be discovered by inspection and testing of the car prior to loading. After trial, judgment was rendered in favor of plaintiff as prayed for against the Railroad, but the other defendants were absolved from liability and plaintiff's demands as against them were dismissed. The Railroad appealed; so did plaintiff insofar as the judgment dismissed its claims against Industrial and Godchaux, in order to keep said defendants before the court.
At the outset we think it meet and proper to examine into the liability velnon *483 of Godchaux. The suit against the Railroad and Industrial is for damages ex contractu, while as against Godchaux the demands must be founded on the theory of tort as there was no contractual relationship whatever existing between plaintiff and Godchaux. The facts are that Godchaux paid Industrial a fee for the privilege of extracting from and retaining a chemical, calcium aconitate, from molasses delivered to Godchaux by Industrial. Under the provisions of the agreement between said parties, Godchaux, under orders from Industrial, would ship to customers of the latter the same or equivalent molasses and the shipment to Southwestern was made under such arrangement. Our opinion is that Godchaux in the matter of loading tank car GATX 15,057 was no more or less than the agent of Industrial and as such owed no duty whatsoever to Southwestern, and cannot be held liable unto the latter for nonfeasance or omission of duty in the loading operation. Agents are not liable to third persons for nonfeasance or mere omissions of duty. They are responsible to third parties only for the actual commission of those positive wrongs for which they would be otherwise accountable in their individual capacity under the obligations common to all other men. Tyler v. Walt, 184 La. 659, 167 So. 182; Allen v. Cochran, 160 La. 425, 107 So. 292, 50 A. L.R. 459; Delaney v. A. Rochereau & Co., 34 La.Ann. 1123; First Federal Savings & Loan Association of Winnfield v. Continental Equity Life Insurance Company, La.App., 124 So.2d 802; Washington v. T. Smith & Son, Inc., La.App., 68 So.2d 337. The judgment so far as it eliminates Godchaux from the suit is correct and must be affirmed.
Plaintiff itself provided tank car GATX 15,057, which it had leased from a third party for the shipment, and there is no evidence there were any mechanical defects or deficiencies therein. The car so furnished was a standard tank car equipped with a GATX four-inch screw-type outlet valve at the bottom of the tank, which is controlled by a hand lever located in the dome of the car connected to a vertical springed rod running to an outlet about five inches in diameter at the bottom of the tank, through which outlet the contents of the car flows by gravity during the unloading process. The lever inside the dome is pushed one way for opening and another way for closing the valve. During transportation a cover is tightly screwed to the top of the dome thus sealing it, and the lever controlling the outlet valve can neither be reached nor operated so long as the dome cover remains in place. Under the car and connected with the outlet valve is an outlet pipe, to the threaded outside, end of which is screwed a metal cap attached to the car by means of a chain. This cap provides an additional seal for the outlet and would itself be sufficient to hold the load in the car if the cap were tightly fastened. The bottom of the springed rod is seated into a nozzle so it cannot be displaced, thus holding it in proper position to close or open the outlet pipe as the case may be, when the lever in the dome is operated. Competent evidence is to the effect that when firmly seated and closed it is virtually impossible for the main outlet valve to open under ordinary movement or handling of the car in transportation.
The rules of the American Association of Railroads provide that in loading a tank car of this type the car should be fully loaded while the outlet cap under the car is off the outlet. The cap is not to be attached and tightened until loading is completed when the cap is to be tightened by means of a forty-eight-inch wrench, the purpose of this being to insure that the cap will not unscrew or work off from vibration during the car's movement.
The testimony of certain employees of Godchaux shows that it was not customary to adhere to the rules of American Association of Railroads with reference to loading tank cars. Godchaux seems to have had its own method of loading molasses which was followed in connection with the car in *484 question. The loading was performed by one Zeringue (assisted by Pertuit), who states his predecessor on the job taught him how. He claims he climbed to the top of the car, opened the dome, checked the interior to see if the car contained residue, checked the visible part of the valve stem and also the seating of the valve plug by moving the lever; then he pulled the loading pipe over and into the dome, descended from the car, unscrewed the discharge cap so as to further check against leakage, and started filling the car. Zeringue states that after the car was from half to three-quarters loaded, he replaced the discharge pipe cap by hand tightening it and continued pumping in molasses until the car was full. The dome was then sealed. He claims everything was in good order and no leakage was discernible. A Vice-President of Godchaux testified that the reason for replacing the cap on the discharge pipe before the car was full was that molasses has a tendency to foam, and that it was often necessary to stop loading the car before it was quite full to allow the foam to settle, and then after that the car would be "topped off" and the outlet cap was screwed on. The witness stated he was never apprised of the American rules until after the occurrence under investigation. All of the witnesses for Godchaux seem to have taken the position that it was only necessary to screw the outlet cap by hand.
At 3:30 o'clock p. m. the following day, upon the car reaching Devers, Texas, as part of Train No. 2-243, the conductor noticed molasses dripping from the outlet pipe. No action to stop the leak was taken by him other than to endeavor to tighten the outlet pipe cap by hand, which task proved too difficult, and the cap would not turn. The conductor stated he "figured that it was as tight as it was ever going to be." The train proceeded on its journey at 4:05 o'clock p. m. with the molasses still dripping. Thirty-five minutes and eighteen and one-half miles later, upon arrival at Dayton, Texas, the conductor discovered the outlet cap completely off and hanging by its chain. Molasses was now flowing out freely and in a steady stream.
The conductor, in company with another member of the train crew, mounted the car, opened the dome, and endeavored to check the flow by manipulating the valve handle and by replacing the outside outlet pipe cap, but they were unable either to reseat the valve or to replace the cap, and so the flow continued unabated. Whereupon the conductor called his dispatcher in Houston, who promptly sent two men to the track on which the car had been set out, and these two men, after unsuccessfully attempting to reseat the valve by manipulation of the handle in the dome, were successful in replacing the outlet pipe cap but only after most of the contents of the car had escaped.
Upon arrival at Houston the railroad's freight claim agent notified Southwestern of the partial loss of the contents of the car and requested that the car be returned to the railroad for mechanical inspection before being reloaded and shipped out again. Somehow this request was not complied with, but this is immaterial. However, Southwestern did have the car inspected, and the person who made the inspection testified that after the car had been made empty, he went inside and ascertained that the valve was completely unseated, the valve stem leading to the handle in the dome resting at an angle rather than in its usual vertical or upright position. This witness, experienced in loading and unloading tank cars, expressed the opinion that if the valve had initially been seated properly, it could not have become unseated while the car was under load.
While it is true the testimony taken on behalf of Godchaux is to the effect that the car was loaded in conformity with that concern's practice, which had proven satisfactory in the past, and that the valve was set and the cap underneath the car was screwed on, we are of the opinion that such evidence is not of such a character as to make it absolutely certain that this was the case. We believe that there was negligence *485 on the part of the employees of Godchaux at the time of loading and that they did not make absolutely certain that the valve inside the car was tightly seated. This conclusion is warranted by the fact that the testimony abounds with assertions that the valve could not have become unseated while the car was under load or from the train's movement. Then again is the fact that the cap under the tank was merely tightened by using the hand rather than by mechanical means. It would seem reasonable to suppose that the cap had not been tightened sufficiently to prevent the motions of the car during transit from unscrewing it, thus permitting the escape of the valuable cargo.
There are some intimations that the car might have been tampered with during the custody of the railroad company, but there is no testimony pro or con on this question. We do not think that the car could have been tampered with. We gain that impression from the testimony to the effect that had the valve been properly set initially and the car loaded, it could not have possibly been unseated so long as the load remained in the car.
Under the contract of sale of the molasses, it was the duty of Industrial to load the car and make shipment to the plaintiff, and there was a breach of this contract in that plaintiff's molasses was not properly loaded and it suffered a loss through this dereliction on the part of Industrial. While the negligence of the employees of Godchaux was the cause of the leakage, such negligence must be imputed to the principal, Industrial, which becomes liable unto plaintiff under the doctrine of respondeat superior.
The question of the carrier's liability now presents itself. This point has been ably argued, both orally and in briefs, and we were cited to numerous authorities by counsel for the railroad, all of which we have carefully examined, but these do not convince us that even though the molasses was improperly loaded into the tank car in the first instance and delivered to the railroad in that condition the carrier is relieved from liability. After discovering a wasting of freight from a car, it becomes the carrier's duty to take such reasonable steps as may be necessary to eliminate waste, and as we find the carrier did not take such reasonable measures in this case, it must be held accountable. This case seems to be on all fours with Southern Cotton Oil Co. v. New Orleans & N. E. R. Co., 146 La. 541, 83 So. 821, 824, wherein a suit was brought against the carrier for waste of oil shipped in an improperly loaded tank car. The Court concluded that the carrier was negligent in not taking efficient steps to stop the leakage en route, and, therefore, held that carrier liable for the loss. The Court said:
"In the face of this testimony, we cannot hold that the officials of this company (the railroad), whose duty it was to have prevented the waste of this valuable freight intrusted to its care as soon as the leak was discovered by them, and which in our opinion required the exercise of no special skill on their part to have accomplished, particularly when we take into consideration the fact that the car in question was solely in defendant's custody and supervision at the time the leak was discovered, had a right to cut this car out of the train, side-track it, and allow its entire contents to leak away, relying solely on the fact that the car in question was the property of the consignors and had been badly loaded by them, thereby escaping liability of what in our opinion was defendant's negligence and want of care, and which negligence was the proximate cause of the damage suffered by the plaintiffs in this case."
The conductor stated that when he first discovered the dripping molasses, all he did was to attempt to tighten the outlet cap by hand. He states that no wrench was available and the only method he could adopt for tightening the cap was manual *486 force. It seems to us that when the train was stopped at Devers, when the dripping first became apparent, and the conductor became apprised of the fact that the cap could not be screwed tightly by hand, he should, and we believe he could, have taken some steps to secure such a simple appliance as a wrench to remedy the situation. It cannot be overlooked that the employees of the railroad who journeyed from Houston to Dayton to investigate the situation were able to reset the cap by the simple expedient of using such a tool.
The liability of carriers is fixed by the Revised Civil Code and has been determined many times under analogous circumstances by the courts of this state. However, we do not believe that citation of decisions of the courts other than the case cited above is necessary to demonstrate liability on the part of the carrier defendant. LSA-C.C. art. 2754 provides:
"Carriers and waterman (watermen) are liable for the loss or damage of the things intrusted to their case, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events."
Even though a shipper may deliver an improperly loaded car to the carrier for transportation, the carrier is not thereby relieved from responsibility for negligence if it could have stopped a wasting of the cargo by the use of simple or reasonable means which might be available.
Where the action is for breach of contract, the term "proximate cause" as used in the law of negligence has no application. 13 C.J.S. Carriers § 80, p. 161.
Also found in 13 C.J.S. Carriers § 80, page 158 are the following doctrines which appear to us to be controlling in establishing the carrier's liability in this case because of concurrent negligence, to-wit:
"Where the carrier relies on one of the exceptions to his common-law liability, it must appear, in order to excuse him, that the exceptional cause, such as an act of God, or the like, was the immediate or proximate, and not the remote, cause of the loss; and it is further said in some cases that to excuse the carrier the act of God, or the like, must be the sole cause of the loss. Thus, if plaintiff's loss proximately results from defendant's breach of contract, defendant is liable even though one of the excepted causes contributes to the loss; and it is very generally declared that, if the negligence of the carrier concurs with the excepted cause in producing a loss or injury, the carrier is not exempted from liability by showing that the immediate cause was the act of God, or some other excepted cause. As otherwise expressed, the carrier is responsible where the loss is caused by an act of God or other excepted cause, if the carrier's negligence mingles with it as an active and cooperative cause. * * *"
No dispute arises over the amount claimed by plaintiff as damages.
It is ordered, adjudged and decreed that that portion of the judgment which runs in favor of Industrial Molasses Corporation, doing business as Manard Molasses Company, dismissing plaintiff's suit as against it be reversed, and it is now decreed that the judgment be amended so as to provide that plaintiff have judgment against said Industrial Molasses Corporation, doing business as Manard Molasses Company, jointly, severally, and in solido, with Texas & New Orleans Railroad Company, in the full sum of $2,916.13, with legal interest thereon from judicial demand until paid, and for all taxable costs of court, and as thus amended and in all other respects, the judgment is affirmed.
Plaintiff is cast for the costs of the appeal taken by Godchaux Sugars, Inc.
Reversed in part; amended and affirmed in part.