# POOLE v. FIRST NAT. BANK OF SMYRNA.—196 S. W. (2d) 563.

Middle Section. April 27, 1946.

Petition for Certiorari denied by Supreme Court, October 5, 1946.

328

330

Roy A. Miles, of Nashville, and John D. Wiseman and A. L. Todd, Jr., both of Murfreesboro, for plaintiff in error.

Granville S. Ridley, of Murfreesboro, for defendant in error.

FELTS, J. A. H. Sanders died August 21, 1943, Mrs. Poole qualified as his administratrix, and on August 5, 1944, the bank filed in the county court its claim against his estate on a note for $1,450, dated November 5, 1928, and due six months after date. She pleaded nil debet and the statute of limitations of six years. Code 1932, Sec. 8600. Plaintiff alleged a new promise by decedent, which she denied. The county court allowed the claim in part, and both parties appealed to the circuit court.

There defendant demanded a jury and the case was heard before the circuit judge and a jury. Defendant moved for a directed verdict at the close of plaintiff's evidence and again at the close of all the evidence, which motions were overruled, and the case was submitted to the jury. After it appeared they could not agree plaintiff moved the court to direct a verdict in its favor, which the court did, and entered a judgment for it against defendant for $3,019.57, and costs. She appealed in error.

Her assignments of error and brief make these insistences: (1) The court erred in allowing witnesses for the bank, its cashier and former assistant cashier, to testify to statements by decedent to make out a new promise because Code, Section 9780 disabled these witnesses to testify to any statement by decedent; (2) such statements were too uncertain and equivocal to constitute a new promise; and (3) the court should not have directed a verdict for plaintiff but should have directed a verdict for defendant.

■ (1) It was not error to admit this testimony, neither of the witnesses being a party to the suit. Code, Section 9780 prevents a "party" to a suit by or against

the representative of a decedent from testifying to a transaction with or a statement by the decedent, but it does not prevent other witnesses from testifying to such a transaction or statement. Montague v. Thomason, 91 Tenn. 168, 175, 18 S. W. 246.

The fact that the cashier was a stockholder, interested in the result, and had handled the transaction as agent for plaintiff did not disqualify him to testify to such transaction or statements by decedent. Montague v. Thomason, supra; Grange Warehouse Association v. Owen, 86 Tenn. 355, 7 S. W. 457; Nashville Trust Co. v. First National Bank, 123 Tenn. 617, 628, 134 S. W. 311; Gibson v. Parkey, 142 Tenn. 99, 105, 217 S. W. 647; Klein v. York, 149 Tenn. 81, 257 S. W. 861, 31 A. L. R. 452.

There is nothing to the contrary in Roy v. Sanford, 140 Tenn. 382, 204 S. W. 1159, 1160, relied on by defendant. It involved a scheme to evade the statute: P claimed deceased had made a note to him by authorizing him to sign deceased's name to it; and, to make himself a competent witness to prove his claim, he transferred it to R to sue on it and recover for his benefit. The Court said: "To tolerate such a scheme would be to sanction a fraud on the act." Obviously, that is no precedent for this case.

(2) It is true most of the statements attributed to decedent were too uncertain and indefinite to constitute a new promise or remove the bar of the statute. The cashier, J. N. Barnett, said that deceased was in the bank "two or three times a week," "several times," "occasionally," and "we (the two of them) would discuss it, even before that was out of date"; and that he refused to renew it, but their conversations were "always pleasant," they "talked it over fifteen or twenty, maybe thirty or forty times," and he always said "he was going to pay it."

A. H. Sanders lived more than 14 years after this note matured and more than eight years after it was barred; and for all that appears these conversations may be referred as well to one part as to another of that period; whether they occurred more than, or within, six years before suit is altogether uncertain. Barnett made no attempt to fix the date of any of his conversations with decedent except the last one, which he first said was "March 20, 1942," and later changed to "March 18, 1940," on referring to a memorandum he said he had made as soon as deceased left the bank that day. As to that conversation he said:

"Q. 74 What was stated at that time between you and Mr. A. H. Sanders? A. He was in the bank that day. He was in there very often and I had talked with him about this note different times.

"Q. 74 With whom did he talk? A. Me. We talked about 30 minutes. No other customer was in the bank during the time. He talked about the note. Owing it; he was going to pay it. In fact, he was borrowing money at that time. He had gotten some money from his father. He had bought a farm and spent $3000 improving the farm; had bought a number of head of cattle, 70 head of cattle and 100 head of sheep; that he still needed more cattle and more sheep for his farm as he did not have enough for his pasture; that when he got to the place he could sell off his cattle that he would pay this note with interest in full—all at one time.

"Q. 76 Do you recall anything said about the note being so old? A. Yes, that it had been out of date 4 or 5 years. Of course, the note showed it out of date. He says, it is out of date but that does not keep me from paying my debts. 'I am going to pay it and pay it all at one time.' "

The other witness to this conversation was A. W. Steel, then assistant cashier. He said he and Barnett signed the memorandum just after deceased went out of the bank. Relating the conversation, he said: "A. Mr. Sanders came in the bank. There was no one in there excepting Mr. Barnett and myself at that time, and he was around at Mr. Barnett's desk and they were talking. Mr. Barnett brought up the subject of the note he owed the bank and asked him could he pay it, or renew it, or straighten it up some way. He said at the present time he could not; that he had to fix up his farm and buy some cattle; that he did not have the money but he was going to pay it when he sold his cattle. I think that is about all.

· · · · ·

"Q. 315 Do you recall any effort to have him sign a renewal note? A. I don't believe he asked him to sign a renewal note, but he said he was going to pay it and was going to pay it when he could.

"Q. 316 That is about all? A. They talked about other subjects.

"Q. 317 He did not ask him to renew it but he said he would pay it, but the note, of course, ran on out of date? A. Yes."

Thus according to Barnett, deceased said "when he could sell his cattle he was going to pay this note," and "I am going to pay it all at one time." According to Steel, he said "he was going to pay it when he sold his cattle," or "he was going to pay it when he could"; and according to both witnesses, these statements were made in March 1940, or within six years before suit. Taken as true, we think they were sufficient to make out a new promise.

To take the case out of the statute, the proof must make out a new contract, either by an express prom-

ise, or by an acknowledgment of the justice of the debt and an expression of willingness to pay it. Hall v. Skidmore, 180 Tenn. 23, 171 S. W. (2d) 274; Id., 26 Tenn. App. 189, 168 S. W. (2d) 800. If the new promise, express or implied from an expression of willingness to pay, is conditional, the plaintiff must aver and prove the condition has been satisfied. Taylor v. Nixon, 36 Tenn. 352, 353; Shown v. Hawkins, 85 Tenn. 214, 2 S. W. 34.

Viewed in either aspect, these statements by decedent were legally sufficient. One of them was unconditional, "I am going to pay it all at one time"; and if the others be regarded as conditioned on his selling off enough of his cattle or his being able to pay, both conditions were met. The proof shows that in August 1942 he sold 30 calves for $3,404.40, and that he was amply able to have paid this note.

██ It is urged, however, that evidence of a conditional promise cannot support the cause of action averred because that was an unconditional promise. It is true proof of conditional promise will not support an averment in the declaration of an absolute, unqualified promise. Taylor v. Nixon, supra. But Chapter 175, Public Acts of 1939, prescribing procedure for suits like this one, dispenses with formal pleadings and strict rules of procedure required in actions commenced in the circuit court. Cooper's Estate v. Keathley, 27 Tenn. App. 7, 177 S. W. (2d) 356, 359.

██ (3) Counsel have discussed the preponderance of the evidence. But it is not our province to decide that issue; we can only review the trial court's action upon the respective motions for a directed verdict to determine whether that court should have sustained one motion or the other or should have denied both and submitted the case to the jury. It is true the rule in some jurisdictions

336

is that the effect of motions by both parties for a directed verdict is to waive a jury trial and to submit to the judge the determination of the whole case upon both the law and the facts; but that is not the rule in this State. Here each motion stands to be separately determined upon its own merits as if the other had not been made. Virginia-Tennessee Hardware Co. v. Hodges, 126 Tenn. 370, 378, 149 S. W. 1056, 1058; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 557, 249 S. W. 984.

■ The rule for determining a motion for a directed verdict has often been stated in numerous cases. It has been fashioned to preserve the constitutional right of trial by jury and to administer the common law separation of function by which the jury try the fact and the judge the law. It requires the trial judge, and the appellate court on review, to look to all the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, to allow all reasonable inferences from it in his favor, to discard all countervailing evidence; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. Wildman Mfg. Co. v. Davenport Hosiery Mills, supra; Brenizer v. Nashville, C. & St. L. Ry, 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S. W. (2d) 1099; Provident Life & Acc. Ins. Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251; Osborn et al. v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510; Patillo v. Gambill et ux., 22 Tenn. App. 485, 492, 124 S. W. (2d) 272, 276; Tennessee Cent. Ry. Co. v. McCowan, Tenn. App., 188 S. W. (2d) 931.

■ In other words, if there is any substantial evidence on which the jury could reasonably find against the movant the judge cannot direct them to return a verdict for him. It is clear defendant's motion was properly de-

nied. In determining it, the judge was bound to assume the jury might believe the evidence for plaintiff and was bound himself to take such evidence as true. So taken, the testimony of plaintiff's witnesses, Barnett and Steel, made out a new promise.

But could his Honor take this testimony as true in determining plaintiff's motion? Could the judge tell the jury they were bound as a matter of law to believe such testimony, and direct them to return a verdict for plaintiff? Or was the credibility of these witnesses and the truth or falsity of their testimony questions for the jury?

The credibility of witnesses is peculiarly a question for the jury, and in determining a motion for a directed verdict the judge has no right to determine the question of the credibility of any witness. Nashville, etc., Railway Co. v. Norman, 108 Tenn. 324, 67 S. W. 479; Kinney v. Yazoo & M. V. Railroad Co., 116 Tenn. 450, 92 S. W. 1116; Anderson v. Stribling, 15 Tenn. App. 267, 279; Patillo v. Gambill et ux., 22 Tenn. App. 485, 493, 124 S. W. (2d) 272. The Constitution (Art. 6, Sec. 9) forbids judges to charge juries "with respect to matters of fact," which include, among other things, the question of the credibility of a witness. Brenizer v. Nashville C. & St. L. Ry., supra; Haskins v. Howard, 159 Tenn. 86, 97, 16 S. W. (2d) 20.

By way of exception to this general rule, it is declared in a number of cases that a jury will not be permitted to disregard testimony arbitrarily or capriciously, that ordinarily the testimony of a witness who is not contradicted, impeached, or discredited must be accepted as true, and that the judge may take such testimony as true in determining a motion for a directed verdict. Frank v. Wright, 140 Tenn. 535, 205 S. W. 434; Gouldener v. Brittain, 173 Tenn. 32, 114 S. W. (2d) 783; Bryan v. Aetna

Life Ins. Co., 25 Tenn. App. 496, 505, 160 S. W. (2d) 423, 429, and cases there cited.

▉ The principle upon which such cases must rest is that it is the office of the judge to keep the trial both of law and fact a rational process, to see that the jury's verdict shall be not only "conformable to legal rules" but also "defensible in point of sense, not absurd or whimsical." But this is a far different thing from imposing on the jury the judge's own private standard of what is reasonable. The standard of reasonableness must be not that of any individual but that of all reasonable men, i.e., the ideal reasonable man. Thayer's Preliminary Treatise on Evidence, pp. 183-207, 208, 209-262.

We think none of this line of cases is authority for directing a verdict for plaintiff upon the testimony of himself or other witnesses interested in the result, or for holding that the jury is bound as a matter of law to believe the testimony of such an interested witness, merely because he is not contradicted, impeached, or discredited. Would all reasonable men agree that such testimony must be believed and taken to be true as a matter of law? We think not. It has not been so long since the common law disqualified all parties and all other interested persons from being witnesses. The reason was that they were conclusively presumed to be unworthy of belief —"can never induce any rational belief." Gilbert on Evidence (Loffts Ed.) 223. "The law will not receive the evidence of any person, even under the sanction of an oath, who has an interest in giving the proposed evidence, and consequently whose interest conflicts with his duty. This rule of exclusion, considered in its principle, requires little explanation. It is founded on the known infirmities of human nature, which is too weak to be generally restrained by religious or moral obligations, when tempted

and solicited in a contrary direction by temporal interests." Starkie on Evidence, 83, 6 Am. Ed. (1837) 18.

The principal argument for abolishing this disqualification was that one's interest should go merely to his credit but not to his absolute exclusion as a witness; i.e., the matter should be taken out of the hands of the judge to be dealt with as law and committed to the jury to be dealt with as fact. It was upon such considerations that statutes were passed in England and in all of the United States abolishing the disqualification, our statute, Code, Section 9777, being passed in 1867. It abolished the disqualification of parties and interested persons as witnesses, with certain exceptions including the one which was continued in force by Section 9780, one of the purposes of which was to protect estates of decedents by preventing the living from testifying against the dead. Kurn v. Weaver, 25 Tenn. App. 556, 580, 161 S. W. (2d) 1005, 1020, and cases there cited.

 And since the general abolishment of interest disqualification of witnesses, it has generally been held that interest alone is enough to make a witness's credibility a question for the jury, and that a verdict may not be directed upon the testimony of an interested witness, even though he is not contradicted, impeached, or discredited.

In Kavanagh v. Wilson, 1877, 70 N. Y. 177, a real estate broker sued an executor upon an alleged agreement with the testator to pay the broker $4,000 for selling real estate. The broker's son testified that he heard the testator make the agreement to pay $4,000. A verdict was directed for plaintiff. It was held that this was error because the plaintiff's son was "not wholly a disinterested witness." It was also pointed out that the testimony was not entirely free from some improbability, because the promise was to pay double the usual price for sale of

property, and because it was not made dependent upon the amount for which the property might be sold. The court said: "Why did he make the unusual promise to pay the absolute sum in no way dependent upon the amount for which the property might be negotiated? The further fact exists that no one was living to contradict the witness if he did not testify truly. All these facts and considerations made this a proper case for the jury, and the court erred in refusing to submit it to them."

We quote a few illustrative statements of the rule:

"It is not often, where a party has the burden of proving a fact by the testimony of witnesses, that the jury can be required by the court to say that the fact is proved. They may disbelieve the witnesses." Anthony v. Mercantile Mut. Acc. Ass'n., 1894, 162 Mass. 354, 38 N. E. 973, 974, 26 L. R. A. 406, 44 Am. St. Rep. 367.

"We think this was error (the direction of a verdict). The jury may have disbelieved the president and cashier, or have believed them only in part, and may have been satisfied on all the evidence that they either had notice, or did not take the note for value before maturity. They were not bound, as a matter of law, to believe the president and cashier, though their testimony was uncontradicted. Twombly v. Monroe, 136 Mass. 464." Merchants' Nat. Bank of Lowell v. Haverhill Iron Works, 159 Mass. 158, 160, 34 N. E. 93.

"They (trustees) were all apparently interested in sustaining the deed, and in denying all knowledge of a fraudulent intent; and while the jury has no right to arbitrarily disregard the positive testimony of unimpeached and uncontradicted witnesses (Lomer v. Meeker, 25 N. Y. 361, 363; Elwood v. Western Union Tel. Co , 45 N. Y. 549, 553, 6 Am. Rep. 140), the very courts that lay down this rule qualify it by saying the mere fact that the witness is

interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact. Munoz v. Wilson, 111 N. Y. 295, 300, [18 N. E. 855]; Dean v. Metropolitan Elev. R. Co., 119 N. Y. 540, 550 [23 N. E. 1054]. Canajoharie Nat. Bank v. Diefendorf, 123 N. Y. 191, 200 [25 N. E. 402], 10 L. R. A. 676; Volkmar v. Manhattan R. Co., 134 N. Y. 418, 422 [31 N. E. 870, 30 Am. St. Rep. 678]; Rumsey v. Boutwell, 61 Hun. 165, 168, [15 N. Y. S. 765]; Roseberry v. Nixon, 58 Hun. 121 [11 N. Y. S. 523]; Posthoff v. Schreiber, 47 Hun. N. Y., 593, 598.'' Sonnentheil v. Christian Moerlein Brewing Co., 172 U. S. 401, 414, 19 S. Ct. 233, 236, 43 L. Ed. 492, 497.

''The issue (of a new promise by a decedent) stood on the unsupported testimony of the plaintiff. The court was not bound to believe her testimony, though not directly contradicted. Miller v. Miller, 89 Vt. 547, 95 A. 928.'' Watts v. Mulliken's Estate, 95 Vt. 335, 342, 115 A. 150, 153.

Numerous cases in other jurisdictions declare that the jury are not bound as a matter of law to believe the testimony of an interested witness, even though he is not contradicted, impeached, or discredited; and that a verdict cannot be directed upon such testimony for a party having the burden of proof. This is the general rule, though there are some authorities to the contrary. See numerous cases cited in the Annotation, 72 A. L. R. 27-59.

This rule prevails in some jurisdictions where judges may comment on the evidence as at common law, and may direct a verdict for a party where it would be their duty on motion for new trial to set aside a verdict against him as contrary to the evidence. There would seem even more reason for the rule in this State where the Constitution forbids the judge to charge the jury ''with respect to mat-

ters of fact," and where he has no such latitude in directing verdicts. See Brenizer v. Nashville C. & St. L. Ry., supra. In Carter v. Kelsey Wheel Co., 168 Tenn. 262, 264, 77 S. W. (2d) 449, our Supreme Court said: "The determination of a fact is arrived at from all of the testimony and surrounding circumstances, and no rule of evidence, of which we are aware, requires the court to arbitrarily accept the testimony of an interested witness, although not directly impeached, when from a consideration of all the evidence a different conclusion is reached from that testified to by such witness."

This language would seem to apply to the testimony of plaintiff's witnesses relied on to establish a new promise. It is true they were not contradicted by any other witness in what they said decedent said to them. Nor could they be, since death had silenced him. But there were circumstances which made their testimony not altogether free from some improbability and which the jury might reasonably have thought justified them in disbelieving these witnesses.

The note in suit was a renewal of a note dated May 5, 1928, and due October 5, 1928. Both the original and the renewal were secured by a mortgage on eight jersey cows, five mules, one Ford car, 50 barrels of corn, and some farming implements. The value of all this property would seem as much as the amount of the note. There was no explanation as to this property. The cashier, Barnett, who handled the whole transaction for the bank, merely said the bank did not take this mortgaged property after the note matured May 5, 1929.

A. H. Sanders is shown to have been amply able to have paid this note at any time during the last five years of his life. He was a stockholder and a depositor in the bank. In 1940 he moved his bank account to a bank in

Murfreesboro and carried a substantial balance in the latter bank until his death. His father, Fate Sanders, was a stockholder in plaintiff bank, and kept in it a large account, which is shown at times to have amounted to as much as $30,000. Fate Sanders died in 1938, and A. H. Sanders inherited quite a bit of property from his father. Mrs. Poole, administratrix of her father's estate, turned over to her brother, A. H. Sanders, $10,000 at one time.

He seems to have had numerous transactions with plaintiff bank. After his father's death he bought a farm in which the bank owned a two-ninths interest. He paid $7,000 for this farm, and he had two or three other farms in which he had a life interest. He had a substantial income from these farms and from dairy cattle, and in 1942 he sold one lot of cattle for $3,404.40. In 1939 he paid Barnett himself $1,352.28, as shown by two checks found by his administratrix. In January 1940 he paid the plaintiff bank $560.65, as shown by another check she found and filed. At his death the only debt his administratrix found he owed was a small amount for his doctor's bill.

The note in suit shows a few small credits for interest during the years 1929 and 1930, the last credit being for interest to November 5, 1930. The record affords no explanation why, if the note represented a valid obligation, the bank allowed it to run out of date, and then further delayed suit more than eight years during Sanders' lifetime, during the last five of which much more than the amount of the note could have been made out of him at any time. On cross-examination the cashier testified:

"Q. 81 Why did you not get this note renewed and keep it up to date? A. I will tell you. This note was due in 1929. Made in 1928 and due in May of 1929. From May 1929 on until 1935 when it ran out of date, I don't know whether you know it or not, was awfully tight

times. It went through the depression, and our bank, the First National Bank of Smyrna, had $125,000 on deposit. In 1932, 1933—4 and 5 Mr. Fate Sanders lived in the first district and had $30,000 on deposit himself. His neighbors and my neighbors in the first district had $15,000 of this money on deposit with us which made $45,000. If we had started suit on this note to have collected it and Mr. Sanders had drawn out his money and his friends watched him just like you would watch some rich man. In other words, he was supposed to be a rich man. If we had done that the bank could not have stood it."

The facts as to the economic depression in the 1930's are a part of the history of the country of which the courts take judicial notice. The interval between May 1929 and May 1935 was not all "awfully tight times." The first part of that period (from May to October 1929) was not a tight time but a time of great inflation. The depression did not begin until November 1929, and it was not until a year or so later that its effects became general. The bank holiday did not come until the early part of 1933. Soon after that all the solvent banks reopened, deposits were insured, and public confidence was restored. The note still had more than two years to run before it became barred May 6, 1935.

Also it is shown that Fate Sanders was himself interested in the bank as a stockholder and was, moreover a very strict man about one paying his debts. He saw to it that his children paid anything they owed. Mrs. Poole said, "He never objected to any pressure. Anything we owed we had to pay it." So the jury could reasonably have found the cashier's explanation unconvincing, so far as it went; and it did not even attempt to account for the last 10 or 11 years of the bank's delay before bringing suit.

Mere lapse of time between the maturity of a debt and an attempt to enforce collection of it may raise a presumption that the debt has been paid. This presumption of payment operates quite independently of any statute of limitations and independently of the equitable doctrine of laches. It is more than a bare presumption; it embraces both a rule of law and also evidentiary matter justifying an inference of fact. While it is rebuttable, the mere fact that the written evidence of the debt is still in possession of the creditor is not enough to rebut the presumption of payment. 40 Am. Jur., Sec. 257, p. 883.

"The rule of presumption of payment, when traced to its foundation, is said to be a rule of convenience and policy, and has been spoken of as a combination of procedural expedient and a conclusion based upon human experience. It was adopted by the law in the interest of repose and the ending of litigation. The presumption rests not only on want of diligence in asserting rights, but on the higher ground that it is necessary, to suppress frauds, to avoid long dormant claims, which, it has been said, have often more cruelty than justice in them; that it relieves courts from the necessity of adjudicating rights so obscured by the lapse of time and the accidents of life that the attainment of truth and justice is next to impossible." 40 Am. Jur. 876.

The length of time necessary to raise the presumption of payment was 20 years at common law; but it has been reduced to 16 years in this State. Blackburn v. Squib, 7 Tenn. 60; Elliott v. Williamson, 79 Tenn. 38, 44. But a period less than 16 years may, in connection with other circumstances shown, authorize an inference of payment and justify the jury in finding that the debt has been paid. In Elliott v. Williamson, supra, through Mr. Justice Cooper the Court said: "Independent of this

arbitrary presumption from the lapse of a fixed period of time, the lapse of an indefinite period, though less than the full term of presumption, is a proper circumstance for the consideration of the jury, and may, in connection with other circumstances, authorize the presumption of payment as a fact: Freeman on Judgments, Sec. 465. Eight years with circumstances have been held sufficient to go to a jury in one case, and thirteen years in another: Leiper v. Erwin, 13 Tenn. 97; Husky v. Maples, 42 Tenn. 25 [88 Am. Dec. 588]." 79 Tenn. 44, 45.

In addition to the long lapse of time in this case, there were other circumstances which cast doubt upon the testimony of plaintiff's witnesses and which suggest these questions:

If the note was not paid, why did the bank not enforce collection of it by foreclosure of the mortgage? What was the reason why no suit was brought within six years from the maturity date of the note? Was that reason the fact that the note had been paid? Or was it the reason given—the precarious condition of the bank and the fear that Fate Sanders might withdraw his $30,000 on deposit? But then what was the reason for the delay after the death of Fate Sanders? If A. H. Sanders still owed the note and continued to recognize it as a debt and to promise to pay it, why did he not renew it? Why was no suit brought on such new promise during his lifetime? Was it because he might be able to furnish proof of payment and an explanation of how the note happened to be left at the bank or with the cashier? Cf. Kavanagh v. Wilson, 70 N. Y. 177, 179, 180.

We think that such questions, which naturally and reasonably arise from the circumstances, reflected upon the testimony of plaintiff's witnesses; and that their credibility was a question of fact to be determined by the

jury and not a question of law to be determined by the judge on motion for a directed verdict.

The judgment of the circuit court is reversed and the case is remanded to that court for a new trial in conformity with this opinion. The costs of the appeal in error are adjudged against the plaintiff bank. The costs below will abide the outcome.

Howell and Hickerson, JJ., concur.