Jerry D. HIGGINS, Plaintiff-Appellant,

v.

Harold VINSON and wife, Hazel Vinson, Defendants-Appellees.

Court of Appeals of Tennessee, Middle Section.

Oct. 29, 1976.

Certiorari Denied by Supreme Court Feb. 7, 1977.

---

1. The statutes requiring licensure for barbers were upheld in *State ex rel Melton v. Nolan,* 161 Tenn. 293, 30 S.W.2d 601 (1930).

William W. Burton and Royce Taylor, Murfreesboro, for plaintiff-appellant.

James W. Buckner, Murfreesboro, for defendants-appellees.

## OPINION

### —The Case—

SHRIVER, Presiding Judge.

This is a suit to recover damages for personal injuries sustained by plaintiff as a result of an accident which occurred on September 15, 1973 when the automobile driven by plaintiff on Highway 53 in Cannon County, Tennessee, collided with a horse belonging to the defendants which was in the highway adjacent to their farm.

The case was tried before the Circuit Judge and a jury and at the close of plaintiff's proof, the Judge sustained defendants' motion for a directed verdict, from which verdict and judgment plaintiff appealed and has assigned errors.

### —Assignments of Error—

There are three assignments as follows:

"1.  The Court erred in directing a verdict in this case at the close of plaintiff's proof where material evidence was presented, which if believed by the jury, would have justified a finding of negligence on the part of defendant and a verdict in favor of plaintiff.

2.  The Court erred in finding that 'there's no concrete proof that this was not a lawful stop-gap.'

3.  The Court erred in failing to apply the doctrine of res ipsa loquitur to the facts in this case."

### —The Pleadings and the Facts—

The original complaint, filed September 13, 1974, charges that on the night of September 15, 1973, plaintiff was driving East on State Highway 53 in Cannon County, Tennessee, in an automobile owned by him; that he was traveling at a lawful rate of speed and was keeping a proper lookout ahead when a horse belonging to the defendants dashed onto the road in front of his car; that he was unable to stop in time to avoid a collision, as a result of which plaintiff sustained severe and painful injuries, incurred expenditures for medical and

hospital care, and his car was totally demolished, the market value of which immediately prior to the accident was $2,750.00; that plaintiff has not been able to work at his regular employment or any gainful occupation since the aforesaid accident, and, as a result, has lost earnings and has been otherwise damaged.

It is also charged that defendants had negligently allowed their horse to escape onto the road by either failing to keep a proper stopgap or allowing the fence and/or stopgap to become in a state of disrepair and that defendants' horse had been known to run at large previously and was then running at large in violation of Section 44–1401, T.C.A., and that defendants, therefore, were guilty of negligence, per se.

By answer, the defendants joined issue on the material allegations of the complaint and as a result of one of the affirmative defenses alleged in the answer, the original complaint was, on motion of plaintiff, amended so as to name Janice Carol Higgins as a plaintiff, insofar as the damages to the automobile are concerned, since said automobile was owned by her and Jerry Higgins jointly.

*Plaintiff, Jerry Higgins,* testified that he and his wife were riding home on the night in question and that as they proceeded along the highway adjacent to the home of the defendants at about 2:00 o'clock a. m., it was dark and foggy. Suddenly, a horse appeared in front of them only a few feet away crossing the road going in the direction of the defendants' house and a stopgap that led to a pasture belonging to the defendants. Plaintiff testified that he was traveling about forty-five miles an hour and that, although he applied his brakes as quickly as possible, it was too late to avoid striking the horse. He stated that the impact was such as to demolish the front of his car, crushing the hood, windshield and the top of the automobile, and that the fair market value of the automobile at the time was about $3,000.00 before the accident and was only about $100.00 as salvage after the accident.

He stated that he went to the house of the defendants and awakened Mr. Vinson who came out and recognized the horse as belonging to him and the record shows that he later had the horse dragged away.

Plaintiff described the horse as being a large gray horse, about sixteen hands high, and one that he had seen in the pasture of the defendants on a number of occasions as he passed along the highway.

Plaintiff described the stopgap which was a part of the enclosure of the pasture in which defendants kept their livestock, including horses. He stated that he had measured the stopgap and found it to be about seven feet wide with approximately four inch gaps between the slats which were made of wood and were either two-by-sixes or two-by-eights. Certain pictures were filed as exhibits showing the fences and the stopgap in question, particularly Exhibit 10 to the testimony of Jerry Higgins which is a close-up view of the stopgap.

When asked about the location of the horse when he first saw it, he answered that it was near the middle of the road going back toward the stopgap and that the horse just dashed out in front of his car.

On cross-examination, he was asked about the condition of defendants' fences and stopgap, to which he answered that they were in good condition but that any horse will cross a stopgap.

At another point he stated that he had seen this same horse out on the road one time previous to the night of the accident.

*Janice Jernigan [Higgins],* on direct-examination, corroborated the testimony of Jerry Higgins as to how the accident happened and the description of the horse. She was questioned concerning her experience with horses and stated that she had been riding for several years. She testified that she had ridden horses across stopgaps a number of times and that her husband, Jerry, had also ridden across stopgaps. She also said she had seen a horse of defendant out on the highway once or twice before the night of the accident and described it as being similar to the one involved here.

She was questioned on cross-examination as to riding across stopgaps on horseback and stated that she had ridden across two or three such gaps on her brother-in-law's farm and that these gaps were put in by the County and substantially like the gap at the Vinson place. She was asked if her brother-in-law kept a gate across the stopgap and she answered: "Yes, he does if he has horses running out."

*Roy Frieze* testified that when he was working in Murfreesboro and was on his way home about 2:00 o'clock one morning, he passed defendants' place. He stated: "I topped a little hill there and there were two horses standing in the road. . . . Probably, 50 feet, maybe 100 feet on down the road from his driveway."

He said that on that occasion his car skidded about 70 feet frontwards and then turned sideways and slid about 25 feet off into a ditch and he told the Vinsons about this experience which occurred adjacent to their place.

*Mike Pemberton* testified that he is a resident of Cannon County, that he usually passed along the front of the Vinson place several times a day; that he was familiar with the horses kept there and described one as a gray horse, about fifteen or sixteen hands high, and stated that he saw one of the horses out on the highway "pretty often . . . I imagine at least about three times a week." When asked if this was the same horse that he saw and if he could identify it, he stated that he could. He stated: "I saw the same horse on the side of the road that I saw in the pasture."

Jack Pemberton, another witness, among other things, testified:

"At one time—I mean on several times because at that particular time of the year we had football practice and of the evenings I would be coming in and I would see a horse out a few times of the evening when I went home.

Q. Could you describe this horse?

A. Yes, sir, he was a big grey horse, stood about 16 hands, I guess, a big horse."

The witness also stated that he had seen this particular horse on Mr. Vinson's farm. He was asked if he had ever ridden a horse across a stopgap and he answered: "Yes, sir." He was then asked and answered:

"Q. Did you train your horse to ride across stopgaps?

A. Well, no sir, . . . I just paced him and he went on across the stopgap, and he has been going across them ever since."

He also testified concerning a horse which he described as similar to the one involved in the accident, stating:

". . . We would come home very evening and sometimes you would see him out two or three times a week."

*Johnny Elkins*, on cross-examination, referring to the horse of defendants', stated: "He was out when Roy wrecked. I seen him before the accident out on a different night coming home from work—it was a grey horse."

Section 44–1401, T.C.A., provides as follows

"*44–1401.   Livestock not to run at large—Punishment.*—It shall be unlawful for the owners of any livestock, as the same are commonly known and defined, to willfully allow the same to run at large in this state. Any person found guilty of a violation of this section will be fined not less than five dollars ($5.00), nor more than twenty-five dollars ($25.00)."

In *Overbey v. Poteat*, 206 Tenn. 146, 332 S.W.2d 197 (1960), reference is made to *Wilson v. White*, 20 Tenn.App. 604, 102 S.W.2d 531 (1937) where it was held that in an action for damages caused by defendant's livestock, a finding that fences inclosing the stock were in good condition and proper repair, was sufficient to show the fences were lawful fences.

It is pointed out, however, in *Overbey* that the opinion of the Court of Appeals in *Wilson v. White* dealt with an 1889 statute, whereas, Section 44–1401, T.C.A., was enacted in 1947. In dealing with the statute as it exists, the Supreme Court said:

"It is our opinion that the Act is designed to cover both the private property

of others as well as highways, and the purpose is to prevent domestic animals from straying anywhere on account of the negligence or wilful conduct of the owner. The above article poses the exact question that we have in this case on page 480 first full paragraph, with reference to relative rights of a motorist on a highway. Inspection of same shows that in the Restatement of Torts, Sec. 518, the rule now is not one of absolute liability but depends upon failure to exercise reasonable care to confine or otherwise control the animal and secondly, that the harm is of a sort which it is normal for animals of its class to do." [206 Tenn. p. 152, 332 S.W.2d p. 200]

It is stated by counsel for appellant that they have been unable to find any statutory law in Tennessee governing stopgaps and that the omission of stopgaps in the statutes governing lawful fences and enclosures, T.C.A. § 44–1401, and particularly § 44–1703 entitled *"Horses, cattle, and mules sufficiently fenced,"* would indicate that a stopgap is not a part of a lawful fence.

As is seen from the evidence hereinabove alluded to and quoted from, it is in nowise uncommon for horses to cross stopgaps of the kind that the defendants below evidently depended upon to enclose their pasture and prevent horses going from that pasture onto the highway.

Defendants rely heavily on *Moon v. Johnston,* 47 Tenn.App. 208, 337 S.W.2d 464, which we consider to be readily distinguishable from the case at bar, especially on the facts. In the instant case there is evidence from which a jury might very reasonably conclude that defendants' horses and, particularly, the horse involved in the accident in question here, had been out of defendants' pasture and onto the

highway on a number of occasions prior to this accident, which defendants knew or should have known, and that, therefore, defendants were negligent in not enclosing their pasture with a suitable gate or fence that would prevent this horse and other horses belonging to them from going out on the highway and, thus, becoming a hazard to motorists, particularly at night.

For the reasons above indicated, it seems clear to us that plaintiff introduced sufficient proof to raise a jury question and that it was error on the part of the Trial Judge to direct a verdict as was done in this case.

We call attention to the oft repeated rule with respect to directed verdicts which was stated in *Poole v. First Natl. Bank of Smyrna,* 29 Tenn.App. 327, 196 S.W.2d 563 (1946), where it was said:

"The Trial Judge, and the Appellate Court on review, are required in determining a motion for a directed verdict, to look to all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor, and to discard all countervailing evidence, and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied."

It results that Assignment of Error No. 1 is sustained, the judgment of the Trial Court is reversed, and the cause is remanded for a new trial.

REVERSED AND REMANDED.

TODD and DROWOTA, JJ., concur.