GLENDA JENNINGS, et vir )
KEITH JENNINGS, )
)
    Plaintiffs/Appellants, )    Appeal No.
)    01-A-01-9804-CV-00192
v. )
)    Sumner Circuit
KENNETH CASE, M.D.; )    No. 16129-C
and CASE MEDICAL CLINIC, P.C.; )
P.C.; W. DAVID STEWART, M.D.; )
and ASSOCIATED SURGEONS, )
)
    Defendants/Appellees. )
)

**FILED**

**August 12, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CIRCUIT COURT FOR SUMNER COUNTY

AT GALLATIN, TENNESSEE


THE HONORABLE TOM E. GRAY, JUDGE

ROBERT J. SHOCKEY
2400 Crestmoor Road, Suite 307
Nashville, Tennessee 37215

JAMES E. MOFFITT
1013 Vista Circle
Franklin, Tennessee 37067
    ATTORNEYS FOR PLAINTIFFS/APPELLANTS


ROSE P. CANTRELL          PHILLIP L. NORTH
GEORGE A. DEAN           North, Pursell & Ramos
Parker, Lawrence, Cantrell & Dean    Nations Bank Plaza
200 Fourth Avenue North        Suite 1850
5th Floor, Noel Place           Nashville, Tennessee 37219-1783
Nashville, Tennessee 37219
    ATTORNEYS FOR DEFENDANTS/APPELLEES


REVERSED AND REMANDED


WILLIAM B. CAIN, JUDGE

# OPINION

      This is a medical malpractice action in which the trial court granted summary judgment to both defendant physicians. The plaintiff has appealed arguing that there existed genuine issues of material fact. We agree with the plaintiff and reverse the decision of the trial court.

Defendant Kenneth Case, M.D. was an employee of Sanders and Case Medical Clinic, P.C. and at all times relevant was acting within the scope of his employment. Defendant W. David Stewart, M.D. was board certified in general surgery. Plaintiff Linda Jennings was initially a patient of Dr. Case and subsequently of Dr. Stewart.

On April 2, 1996, Glenda Jennings went to the hospital emergency room complaining of left arm pain from her elbow to her hand. On April 5, 1996, she visited Dr. Case complaining of the same symptoms. Dr. Case diagnosed repetitive use syndrome and tendinitis, thereupon prescribing Motrin 800 milligrams three times per day along with "no work" for one week. Dr. Case again saw Plaintiff on April 10, 1996, and approved her return to work the following Monday. Plaintiff returned to see Dr. Case on April 19, 1996. Her complaints on that date were continuing left arm pain and blue nail beds. Dr. Case, suspecting thoracic outlet syndrome, referred Plaintiff to Dr. David Stewart, and Dr. Case's office immediately scheduled for her an appointment with Dr. Stewart on April 23, 1996. In all, Dr. Case saw and evaluated Plaintiff for her left arm symptoms three times in the two week period from April 5 through April 19, 1996, and promptly referred her to an appropriate specialist when he first noted the blue nail beds, suggestive of a vascular abnormality.

Defendant Dr. Stewart examined Plaintiff on April 23, 1996 and concluded that thoracic outlet syndrome remained a possibility but also that her problem might be carpal tunnel syndrome. He ordered nerve conduction studies which were reported to him on April 29, 1996 as being normal. Though Plaintiff was scheduled to return to Dr. Stewart for a follow up visit, she did not see him again after the April 23 examination.

The symptoms of Glenda Jennings continued with increased severity, and she visited Dr. Verne Allen in early to mid-May. Diagnostic studies at Nashville Memorial Hospital indicated embolus or thrombus in the left subclavian artery. She underwent a series of vascular surgeries beginning on May 13, 1996, and her left forearm with elbow was amputated on May 17, 1996 by Dr. Lawrence Pass.

On November 1, 1996, Plaintiff and her husband Keith Jennings filed suit against Drs. Case and Stewart alleging conduct by both doctors which fell below the applicable standard of care. Drs. Case and Stewart denied liability in their own affidavits and presented, in support of their motion for summary judgment, additional affidavits from Dr. James B. Atkinson, a pathologist at

Vanderbilt University Medical Center, who had microscopically examined specimens of the thrombus removed from Plaintiff, and Dr. Anthony B. Dallas, Jr., a medical doctor in Hendersonville, Tennessee. The record on summary judgment also includes the deposition of Dr. Stewart taken May 22, 1997. To rebut the summary judgment motion, Plaintiff presented the affidavit of Dr. Joseph W. Rubin, professor of surgery at the Medical College of Georgia in Augusta, Georgia dated January 29, 1998 and a supplemental affidavit from Dr. Rubin dated March 2, 1998. The trial judge granted summary judgment to all defendants without factual comment on March 20, 1998. Plaintiffs timely appealed.

The following familiar rules of law are not in dispute:

1. The standard of care in a medical malpractice action and the deviation from such standard of care along with proximate cause must be established by expert testimony in all cases not within the experience or knowledge of a layman. Tenn. Code Ann. § 29-26-115 (1980); *German v. Nichopoulos*, 577 S.W.2d 197, 202 (Tenn.App.1978); *Stokes v. Leung*, 651 S.W.2d 704, 706 (Tenn.App.1982).

2. The trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party on summary judgment and allow all reasonable inferences in favor of that party, discarding all countervailing evidence. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993).

3. After applying this rule, if "there does exist a dispute as to facts which are deemed material by the trial court, . . . or . . . there is uncertainty as to whether there may be such a dispute," the summary judgment motion must be overruled. *Evco Corp. v. Ross*, 528 S.W.2d 20, 25 (Tenn.1975).

4. The question to be resolved is whether or not the two affidavits of Plaintiffs' qualified expert, Dr. Rubin, are sufficient to preclude summary judgment.

I.      THE DUTY ANALYSIS

This court has held: "Whether there is a duty owed by one person to another is a question of law to be decided by the court. However, once a duty is established, the scope of the duty or the standard of care is a question of fact to be decided by the trier of fact." *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn.App.1990). Like the Rule Against Perpetuities, it is easy to say but difficult to apply. This "duty as law-scope of duty as fact" has produced a

plethora of reported cases in every context imaginable, blurring the line of demarcation to the point that one is compelled to wonder how long the courts can make "soda and vinegar to dwell placidly in the same bottle."[1]

This is a medical malpractice case wherein the physician-patient relationship existed between Glenda Jennings as patient and Kenneth Case and W. David Stewart as physicians. *Osborne v. Frazor*, 425 S.W.2d 768 (Tenn.App. 1968); *Bass v. Barksdale*, 671 S.W.2d 476 (Tenn.App.1984).

> Professionals are judged according to the standard of care required by their profession. In *Delmar Vinyards v. Timmons*, 486 S.W.2d 914, 920 (Tenn.App.1972), the Court stated: "The standard of care applicable to the conduct of audits by public accountants is the same as that applied to doctors, lawyers, architects, engineers, and others furnishing skilled services for compensation and that standard requires reasonable care and competence therein." *See Cleckner v. Dale*, 719 S.W.2d 535 (Tenn.App.1986) (Attorney must exercise the degree of care and diligence which is commonly possessed and exercised by attorneys practicing in the same jurisdiction.); *Truan v. Smith*, 578 S.W.2d 73 (Tenn.1979) (Physicians must exercise reasonable and ordinary care commensurate with his skill and knowledge.).

*Dooley*, 805 S.W.2d at 384-85 (Tenn.App.1990). In this case the duty analysis must be made in the context of the admitted physician-patient relationship and not on principles of duty to foreseeable third persons. *See, e.g. Bradshaw v. Daniel*, 854 S.W.2d 865 (Tenn.1993); *Pittman v. Upjohn Co.*, 890 S.W.2d 425 (Tenn. 1994).

> The relationship of physician or surgeon and patient is one arising out of a contract, express or implied. 70 C.J.S. Physicians & Surgeons, s 37.
> The relation of "physician and patient" is created when the professional services of a physician are accepted for a purpose of medical or surgical treatment, the relation being a contractual one, wherein patient knowingly seeks assistance of a physician and physician knowingly accepts him as a patient. *Findlay v. Board of Supervisors*, 72 Ariz. 58, 230 P.2d 526, 24 A.L.R.2d 841 (1951).
> The Hippocratic Oath by which every doctor is morally bound, assumes a preexisting relationship with patient and physician, which relationship in its inception is basically contractual and wholly voluntary, created by agreement, express or implied, and by its terms may be general or limited. *Agnew v. Parks,* 172 Cal.App.2d 756, 343 P.2d 118 (1959).

*Osborne*, 425 S.W.2d at 771.

---

[1] E. W. Carmack, Editorial, Nashville Tennessean, Nov. 9, 1908, *quoted in Cooper v. State*, 138 S.W. 826, 832 (Tenn.1911).

II.     KENNETH CASE, M.D. and SANDERS & CASE MEDICAL CLINIC, P.C.

Dr. Case does not dispute his contractual physician-patient relationship to Mrs. Jennings.  He asserts, however, that his referral of her to Dr. Stewart on April 19, 1996 ended his obligations to her.  This court has held relative to the duty of referral:

> In 132 A.L.R. 392 is found the following general statement:
>
> > "It may be stated as a general rule that, as a part of the requirements which the law exacts of general practitioners of medicine and surgery, or other schools of healing, if, in the exercise of the care and skill demanded by those requirements, such a practitioner discovers, or should know or discover, that the patient's ailment is beyond his knowledge or technical skill, or ability or capacity to treat with a likelihood of reasonable success, he is under a duty to disclose the situation to his patient, or advise him of the necessity of other or different treatment."
>
> The many cases analyzed under this annotation support the insistence of the plaintiff, the admission of the defendant, and the testimony of the defendant's witnesses that the chronic, persistent condition of the patient in this case required the defendant to recommend treatment by specialist.
>
> Since defendant's duty to refer his patient to more competent specialized medical authority was clearly established, the question remains, did the defendant perform that duty?

*Osborne*, 425 S.W.2d at 773.

In support of his motion for summary judgment, Dr. Case filed the affidavit of Anthony V. Dallas, Jr., M.D., which states in part:

> More specifically, Dr. Case alertly and promptly reacted on April 19, 1996 with regard to the patient's new symptom of blue nail beds.  Suspecting a vascular or neurological insufficiency, Dr. Case referred Glenda Jennings to a surgeon who could appropriately evaluate, provide surgical intervention, or make further referrals for the patient's problem, whether it proved to be neurological or vascular.

The undisputed testimony of Dr. Stewart reveals:

BY [PLAINTIFFS' LAWYER]:

Q.   . . . You first saw the plaintiff on April the 23rd; is that correct, Glenda Jennings?
A.   Yes, sir, I believe that is right.
Q.   All right.  Now, prior to you seeing her in your office, did you have any information about why she was coming to see you?  Dr. Case evidently made a referral; is that correct?

A. He made a referral, and the referral was made through my personnel. And a note was made that he was sending her to me to consider the possibility of a thoracic outlet syndrome. That was the only information I had.

Q. Did he send you a copy of his records?

A. No, sir.

Q. Of, you know, her visits to him in the preceding several weeks about arm pain?

A. No, sir.

Q. All right. Did you talk to him on the telephone?

A. No, sir.

Q. All right. So without belaboring this, you didn't have any information that was contained in his records which indicated that he or his nurse a week prior -- that's not a week prior -- I guess four days prior in examining the left arm noted that her nail beds were blue?

A. No, sir.

Dr. Rubin, in his affidavit in support of the plaintiff, states in part:

2. Dr. Case violated the applicable standard of care in failing to provide Dr. Stewart with his (Dr. Case's) records, which contained important information concerning Mrs. Jennings condition relative to her left upper extremity. He also violated the standard of care in failing to discuss the case with Dr. Stewart after the nerve conduction studies virtually ruled out carpal tunnel syndrome or thoracic outlet syndrome involving serious nerve injury or problems, and in failing to initiate vascular testing. Furthermore, in her deposition Mrs. Jennings relates that she told Dr. Case about her hand being cold, and difficulty in finding a pulse. If this testimony is accurate, Dr. Case's failure to inform Dr. Stewart of these reported signs and symptoms, and the fact that her nail beds were blue, was a violation of the standard of care.

Plaintiff's theory is that this slip between the two doctors is a cause of her injuries. This theory has a basis in the law of Tennessee :

When two or more physicians treat a patient, they are required to coordinate their evidence and communicate "in a manner that best serves their patient's well-being." The "extent" of the physician's "involvement" decides what effort he must take to satisfy his obligation to communicate. This is a question of fact which depends upon the standard of care in the community. Dr. Shmerling's testimony is that he was Mrs. Bass' primary physician and that the standard of care in the community required him to know what drugs Mrs. Bass was taking. If the jury believed Dr. Shmerling's contention that he had turned the patient over to the public health department for treatment, it was necessary to communicate in order to determine the type of drugs that were to be prescribed for her treatment of tuberculosis under what he admits is his standard of care in the community.

*Bass v. Barksdale*, 671 S.W.2d 476 (Tenn. App. 1984).

Plaintiff has the burden of proving that the specific breach of the standard of care alleged as to Dr. Case was a cause in fact of her injury. To be successful at trial in her claim against Dr. Case, she must prove, by a preponderance of the evidence that as a result of Dr. Case's omission to communicate her symptoms to Dr. Stewart, she suffered injuries which "would not otherwise have occurred." Tenn. Code Ann. § 29-26-115(a)(3). In *Kilpatrick v. Bryant*, 868 S.W.2d 594 (Tenn. 1993), the Supreme Court reiterated that the standard for causation in medical malpractice cases is whether the physician's act or omission more likely than not was the cause in fact of the harm. Expressed another way, the test is whether the injury would not have occurred but for the defendant's negligence. *Volz v. Leeds*, 895 S.W.2d 677, 679 (Tenn. 1995).

In *Kilpatrick*, the Court found it determinative that the Plaintiff's expert did not state that the delay in diagnosis "caused Mrs. Kilpatrick to suffer irreparable damage. It merely states that there is a likelihood or probability that the delay would cause irreparable damage." *Kilpatrick*, 868 S.W.2d at 597. Plaintiff's expert evidence herein suffers from no such "probability" problem. Dr. Rubin, in his affidavits, testified:

> If Dr. Stewart or Dr. Case had made a timely and accurate diagnosis of Mrs. Jennings' condition, it is more likely than not that prompt and appropriate treatment would have prevented not only the need for amputation but also the ARDS suffered by Mrs. Jennings;
>
> . . .
>
> Generally speaking, most competent vascular surgeons believe that expeditious diagnosis and treatment is of paramount importance in cases involving vascular occlusion of an upper extremity. The viability of the extremity will depend upon the speed with which the diagnosis is made and appropriate care instituted. We know that early detection and subsequent repair of the underlying stenotic lesion will result in dramatically improved patency and salvage rates. Excellent limb salvage rates are obtainable when delayed diagnosis and delayed treatment are avoided;
>
> . . .
>
> Proper examination, testing and intervention would have saved her arm.
>
> . . .

For purposes of resolving the issue of the grant of summary judgment, we are required to take the strongest legitimate view of Dr. Rubin's affidavit in favor of Mrs. Jennings, allow all reasonable inferences in her favor, and discard all countervailing evidence. *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993).[2] Implicit in Dr. Rubin's causation statements is the conclusion that proper examination would have included review of Mrs. Jennings' medical history including signs and symptoms observed by Dr. Case. Regarding these records, Dr. Rubin stated:

> Dr. Case violated the applicable standard of care in failing to provide Dr. Stewart with his (Dr. Case's) records, which contained important information concerning Mrs. Jennings' condition relative to her left upper extremity.
>
> ...
>
> Furthermore, in her deposition Mrs. Jennings relates that she told Dr. Case about her hand being cold, and difficulty in finding a pulse. If this testimony is accurate, Dr. Case's failure to inform Dr. Stewart of these reported signs and symptoms, and the fact that her nail beds were blue, was a violation of the standard of care;
>
> ...

Thus, Plaintiff has provided expert testimony to the effect that the failure of Dr. Case to provide information about Mrs. Jennings's signs and symptoms was a cause of the failure to timely and accurately diagnose and, therefore, a cause of the injuries suffered by Plaintiff.

Dr. Stewart's statements that Dr. Case's records would have made no difference in the examination procedures he adopted were in response to questions regarding only one symptom: blue nail beds. While Plaintiff's expert, Dr. Rubin, discusses blue nail beds, he also specifically states that Plaintiff's report to Dr. Case of cold hand and pulselessness should have been conveyed to Dr. Stewart. Nowhere in his deposition does Dr. Stewart state that knowledge of those two signs and symptoms would have made no difference. To the contrary, a reasonable fact finder could conclude from Dr. Stewart's full testimony that knowledge of those earlier symptoms would have made a difference in the actions Dr. Stewart took.

---

[2]Judge Koch, in dissent, asserts in effect that the majority opinion grants partial summary judgment to Dr. Case on two out of three theories of liability asserted by plaintiffs. We disagree. The defendant Case neither sought in the trial court nor was granted by the trial judge, partial summary judgment on any asserted theories. The motion for summary judgment is a general one, addressing the entire case asserted by plaintiffs, and the order granting summary judgment is general and not issue specific. This general order granting summary judgment is herein reversed. Appellate review of trial on the merits is for the future.

In his deposition, Dr. Stewart discusses the symptoms and signs of vascular occlusion, which he did not include in his initial diagnosis as a possible cause of Mrs. Jennings's problems. Dr. Stewart is of the opinion that Mrs. Jennings had two different conditions: thoracic outlet syndrome at the time he saw her and, later, vascular occlusion. His position is that she developed symptoms of vascular occlusion after her only appointment with him.

A. My opinion is – and this is absolute – is that she had dramatic changes in her findings and her symptoms after I saw her that one time, and on the basis of that, yes, I believe that she developed her vascular occlusion after I saw her on the morning of that single visit.

Q. What were the dramatic changes in her symptomatology that you're talking about that occurred after you saw her? List those for me.

A. They are the ones that are related in Dr. Verne Allen's record.

Q. What? Name them for me. Severe pain?

A. She had severe pain. She had discoloration. She had **coldness,** and she had an **absent radial pulse**.

When asked specifically what symptoms would be present in a patient suffering from an upper extremity arterial occlusion but would not be present in a patient with thoracic outlet syndrome, Dr. Stewart stated that, "coldness or coolness would be the one that would come to my mind that would be specifically not to be looked at in the thoracic outlet syndrome." Similarly, at one point, Dr. Stewart was asked whether it would have made a difference if Mrs. Jennings had presented the same symptoms when he examined her as she had apparently presented the night before at the emergency room. "The symptomology that was presented the night before about diminished pulse in the left hand, about patchy blue areas . . . would you have had vascular occlusion in your differential diagnosis?" Dr. Stewart answered yes.

Thus, Dr. Stewart provides testimony that can be interpreted to mean that the symptoms of cold hand and pulselessness would have been relevant to his diagnostic procedures had he known about them. Therefore, his testimony does not provide unrefuted evidence of the lack of causation in Dr. Case's failure to transmit Mrs. Jennings' signs and symptoms.

Even Dr. Stewart's statement that the records regarding "blue nail beds" would not have changed his approach cannot form the basis for dismissal of Mrs. Jennings's cause of action against Dr. Case. Dr. Stewart's statements that he would not have done anything differently even if he had received all Dr. Case's information regarding the patient's signs and symptoms constitute

conclusions or speculation about what Dr. Stewart would or would not have done in a situation which never occurred.

It is well settled that testimony which amounts to mere speculation is not evidence which can establish proximate cause. *Primm v. Wickes Lumber Co.*, 845 S.W.2d 768, 771 (Tenn. App. 1992). Similarly, "the mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion." *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985). Applying this principle to expert proof of proximate cause in a medical malpractice case, this court has held that since a judgment cannot be based on conjecture or speculation, the probable cause of an injury must be shown to be reasonably certain, and not a mere likelihood or possibility. *White v. Methodist Hosp. South*, 844 S.W.2d 642, 649 (Tenn. App. 1992). Logic demands that the converse is true: speculation about a situation which never occurred cannot constitute evidence sufficient to prove lack of causation.

It is well settled that the testimony of a physician as to what he would do or his opinion of what should have been done does not prove the standard of care.[3] *Roddy v. Volunteer Medical Clinic, Inc.*, 926 S.W.2d 572, 578 (Tenn. App. 1996); *Lewis v. Hill,* 770 S.W.2d 751, 754 (Tenn. App. 1988); *Crawford v. Family Vision Center, Inc.*, 1990 WL 177351 (Tenn. App. 1990). In *Roddy*, this principle was applied to a physician's affidavit which failed to state that the plaintiff had suffered injuries from the defendant's negligence which would not otherwise have occurred, therefore failing to prove causation. In *Crawford*, the court found that the ophthalmologist-witness did not testify as to the recognized standard of acceptable practice, but only testified as to the practice in his own office. The court found such testimony insufficient to establish the standard of practice. Based upon these holdings, Dr. Stewart's statements as to the potential effect of the lack of Mrs. Jennings' prior history do not establish the absence of causation.

Even discounting the portion of Dr. Rubin's affidavit relative to discussion with Dr. Stewart about the nerve conduction studies which occurred after the referral, it is still clear that according to Dr. Rubin's expert testimony,

_____

[3] The validity of this principle is made clear in the instant case. Because of the nature of Dr. Stewart's statements, no evidence exists which could be used to directly rebut those statements. What Dr. Stewart believes he would have done in a hypothetical situation is incapable of being disproved by anyone else. The best Plaintiff can do, and what she has done, is present expert testimony that her prior symptoms should have made a difference under the applicable standard of care. Thus, there is a fundamental problem with dismissing Plaintiff's claims against Dr. Case on the basis of Dr. Stewart's statements that he would have done nothing different in a situation which never occurred.

the failure of Dr. Case to inform Dr. Stewart of the signs and symptoms he observed on April 16, 1996, including the fact that Plaintiff's nail beds were blue, violated the standard of care. This conclusion by Dr. Rubin is buttressed by the affidavit of Dr. Dallas that Dr. Case "alertly and promptly reacted" to the patient's new symptom of blue nail beds from which Dr. Case suspected "a vascular or neurological insufficiency." Dr. Case had a duty to refer Mrs. Jennings but whether such "referral" can be accomplished in silence or must be accompanied by appropriate information provided to the referee in order to meet the standard of care is a question of fact raised by expert testimony and precludes summary judgment.

The applicable standard of care is set by Tennessee Code Annotated section 29-26-115. "The testimony of a physician as to what he would do or his opinion of what should have been done does not prove the statutory standard of medical practice." *Lewis v. Hill*, 770 S.W.2d 751, 754 (Tenn.App. 1988).[4]

III.      DR. W. DAVID STEWART

The physician-patient relationship was established between Glenda Jennings and Dr. Stewart when he first examined her on the morning of April 23, 1996. The affidavit of Dr. Rubin provides in part:

> 3.      Dr. Stewart violated the applicable standard of care in failing to observe symptoms indicative of arterial obstruction during the patient visit of April 23, 1996 that were there to be seen or appreciated. These signs and symptoms included severe pain in the left shoulder, arm and hand; patchy, blue discoloration of the left hand; and decreased pulse in the left upper extremity. All of these symptoms had been present in the previous evening at the Columbia/HCA Hendersonville Hospital Emergency Room, at 11:30 p.m. The same signs and symptoms noted at the Hendersonville Hospital ER on the evening prior to Dr. Stewart's examination of Mrs. Jennings were more likely than not present when Dr. Stewart examined Mrs. Jennings approximately 10 hours after her ER visit. Dr. Stewart's failure to note the symptoms of left upper extremity occlusion caused his failure to initiate appropriate treatment.

---

[4]Judge Koch in dissent asserts that there is no objective basis for the trier of fact to disbelieve Dr. Stewart's testimony that the clinical notes of Dr. Case would have had no effect on his subsequent treatment of her. The dissent further asserts that Dr. Stewart's testimony on this point is against his own interest. These statements by the co-defendant Dr. Stewart are doubtless helpful to Dr. Case but not necessarily against the interest of Dr. Stewart. Any statement by Dr. Stewart attributing diagnostic value to him of clinical notes and information not disclosed by Dr. Case would tend to detract from his own treatment of Mrs. Jennings. His testimony is self-serving as well as serving the interest of Dr. Case. This is summary judgment and he is a party in interest to the outcome of the case. This alone makes his credibility a question for the jury. *Poole v. First Nat'l Bank of Smyrna*, 196 S.W.2d 563, 568-69; *Price v. Allstate Ins. Co.*, 614 S.W.2d 377, 379; and *Cole v. Clifton*, 833 S.W.2d 75, 77.

Dr. Stewart, in his deposition, agreed with the "more likely than not" opinion of Dr. Rubin. Dr. Stewart testified as follows:

> Q. . . . You're saying that if a patient actually has a thoracic outlet syndrome, the symptomatology that she presented on the night of April 22nd and the findings of the 22nd could well be absent the next day when she saw you.
> A. Yes, sir.
> Q. All right. Now, let's say that it is not a thoracic outlet syndrome that is her problem, that the pain, the discoloration, the blue discoloration, the weaker pulse in the left hand than the right, the patchy blue areas, was caused by a vascular obstruction. If that was the case on April 22nd, 1996, if that was the case, would you have expected all of these symptoms to be present the next morning when you saw her?
> A. Most likely.
> Q. All right. Most likely, correct?
> A. Yes, sir.

Dr. Rubin further asserted that Dr. Stewart failed to obtain an adequate family history and failed to perform an adequate physical examination by evaluating all pulses and blood pressure in both arms to exclude arterial stenosis or obstructions. Dr. Stewart testified that his pulse readings and evaluations were limited to the left extremity.

In defense Dr. Stewart presented the affidavit of Dr. James B. Atkinson, Director of the Laboratory of Surgical Pathology for Vanderbilt University Medical Center. Dr. Atkinson opined that the thrombi removed from the left subclavian artery of Glenda Jennings on May 13, 1996 could not have been present before May 1, 1996 and thus would not have existed at the time Dr. Stewart examined Mrs. Jennings on April 23, 1996. Dr. Rubin countered in his affidavit asserting the following:

> 9. Dr. Atkinson's Affidavit pertaining to the age of the thrombi which occluded the arteries of Mrs. Jennings' left arm makes no effort to address the question of whether or not the condition that *caused* the thrombi did or did not exist on or prior to May 1, 1996. The age of the thrombi studied by Dr. Atkinson is in no way dispositive of the issue of Mrs. Jennings' condition on and prior to May 1, 1996. It is further my opinion that the occlusive condition did exist at those times, and timely treatment would have prevented the thrombi that ultimately caused the loss of Mrs. Jennings' arm. Dr. Atkinson's Affidavit truly begs the question of causation. Assuming that his findings are accurate in that the thrombi removed from Mrs. Jennings' left subclavian artery which occluded "these arteries of Mrs. Jennings" and ultimately necessitated the amputation of her arm, were less than 24-48 hours in age and in some cases 10-11 days in age, one could well conclude that these thrombi were not present prior to May 1, 1996. However, the essential point is that these "offending" thrombi would have been *prevented* but for the negligence of Drs. Case and Stewart in failing to diagnose

Mrs. Jennings' subclavian occlusive problem earlier. Based upon a reasonable degree of medical and scientific certainty, Mrs. Jennings had signs and symptoms of upper extremity vascular occlusion well prior to May 2, 1996, which should have been observed by Drs. Case and Stewart, which observation should have permitted accurate diagnosis and treatment by competent physicians. Such diagnosis would have required immediate medical treatment, which treatment would more likely than not have prevented the very thrombi and occlusions discussed by Dr. Atkinson. Drs. Case and Stewart had the opportunity and the responsibility to stop the disease progression which they failed to do, resulting in the thrombi mentioned in Dr. Atkinson's Affidavit.

Thus, regardless of the age of the thrombi, a question of fact remains as to Dr. Stewart's compliance with the applicable standard of care.

IV.     CONCLUSION

The record establishes the foregoing questions of fact as to compliance with the applicable standard of care which under *Dooley v. Everett* address the scope of the duty rather than the duty itself, scope of duty and standard of care being synonymous terms under *Dooley*. 805 S.W.2d 380, 384 (Tenn.App.1990). What the trier of fact may do with this case at trial remains to be seen. What this court must do on summary judgment is clear. As to both defendants, there exists a dispute as to material facts or at the very least "there is uncertainty as to whether there may be such a dispute." *Evco Corp. v. Ross*, 528 S.W.2d 20, 25 (Tenn. 1975). The action of the trial court in granting summary judgment for the defendants is reversed and the case is remanded to the trial court for trial on the merits. Costs of this appeal are assessed equally to the defendants.


_____
WILLIAM B. CAIN, JUDGE

CONCUR:


_____
PATRICIA J. COTTRELL, JUDGE



CONCURRING IN PART,
DISSENTING IN PART UNDER
SEPARATE OPINION
WILLIAM C. KOCH, JR., JUDGE