IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 19, 2002 Session

## JUDITH ANN STEELE, ET AL. v. COLUMBIA/HCA HEALTH CARE CORPORATION, ET AL.

**Direct Appeal from the Circuit Court for Weakley County**
**No. 3327     William B. Acree, Jr., Judge**

---

**No. W2001-01692-COA-R3-CV - Filed May 13, 2002**

---

This is a medical malpractice case. Plaintiff's husband, Mr. Steele, arrived at Defendant's emergency room complaining of chest pains. An EKG illustrated that he was suffering a heart attack. Mr. Steele underwent subsequent treatments and an additional EKG. The second EKG was abnormal, and Dr. Urankar, a physician at Defendant's emergency room decided to administer tPA, a "clot busting" drug. While Dr. Urankar was preparing to administer the tPA, Mr. Steele's condition significantly worsened, and he eventually died. At trial, Plaintiff introduced expert testimony from Dr. Carr regarding the applicable standard of care and causation. Defendant objected to portions of Dr. Carr's testimony. The jury awarded Plaintiff damages, and Defendant appeals, citing error in Dr. Carr's testimony. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY K. LILLARD, J., joined.

Thomas Pinckney, Nashville, Tennessee, for the appellants, Hospital Corporation of Tennessee d/b/a Columbia Volunteer General Hospital and Nancy Urankar, M.D.

T. J. Emison, Jr., Alamo, Tennessee, for the appellee, Judith Ann Steele.

### OPINION

On August 8, 1996, Paul Steele and his friend, Tommy Akin, had lunch together. After lunch, Mr. Steele decided to help Mr. Akin move some furniture into Mr. Akin's daughter's apartment. While moving the furniture, Mr. Steele began to experience chest pains. The pain persisted, so Mr. Akin drove Mr. Steele to the emergency room at Columbia Volunteer General Hospital in Martin, Tennessee.

Shortly before 2:00 p.m., Mr. Steele arrived at Volunteer. Soon after Mr. Steele's arrival, Marcia Huffstetler, R.N., received a call that Mr. Steele was in the triage area. Ms. Huffstetler recorded the time of the call as 2:14 p.m. When Ms. Huffstetler reached the triage room, Mr. Steele was pale, sweating profusely, and complaining of pain in the center of his chest. Ms. Huffstetler then guided Mr. Steele to a treatment area in the emergency room. Immediately thereafter, Ms. Huffstetler phoned for an electrocardiogram (EKG), lab work, and a chest x-ray. The EKG was completed at 2:16 p.m. and was abnormal. Mr. Steele rated his chest pain at 5 on a 1 to 10 scale.

At approximately 2:20 p.m., Dr. Nancy Urankar arrived at the treatment room. Dr. Urankar examined Mr. Steele and read the EKG. After Dr. Urankar's examination of Mr. Steel, she ordered that he be given aspirin and nitroglycerine, which he received at 2:30 p.m. The nitroglycerine and aspirin relieved Mr. Steele's chest pain somewhat, and at 2:35, he reported a pain level of 3.

At 2:50 p.m., Mr. Steele reported a pain level of 2-3 to Ms. Huffstetler. This report was followed by another dose of nitroglycerine. This second administration of nitroglycerine caused Mr. Steele's pain to subside, and at approximately 3:00 p.m., he told Dr. Urankar that he was fine. This physical state did not last, however, and at 3:02 p.m., Mr. Steele reported a pain level of 2-3. Dr. Urankar ordered another EKG. The second EKG was very much like the initial EKG; therefore, Dr. Urankar concluded that Mr. Steele was indeed having a heart attack.

Dr. Urankar decided to administer tissue plasminosen activator, or tPA, a drug used to dissolve blood clots. Dr. Urankar obtained a consent form and at 3:20 p.m., went to Mr. Steele's room to administer the tPA. While Dr. Urankar was discussing the risks associated with tPA, Mr. Steele became light headed and lost consciousness. A heart monitor suggested that Mr. Steele went into ventricular fibrillation and Dr. Urankar called a cardiac arrest code.

Dr. Urankar and the medical staff began resuscitation efforts immediately. The resuscitation efforts were initially successful; Mr. Steele had a good pulse and a blood pressure at 3:45 p.m. Minutes later, Mr. Steele could move his legs. Dr. Urankar called Dr. Kenneth Carr, the doctor on call for the emergency department, to aid in admitting Mr. Steele into the hospital. While Dr. Carr was arranging for Mr. Steele's transfer, Mr. Steele again went into ventricular fibrillation. Dr. Carr led the subsequent resuscitation attempt, but Mr. Steele would never recover. At 4:20 p.m., Mr. Steele was pronounced dead.

Ms. Judith Ann Steele sued Columbia/HCA Health Care Corporation, Columbia Volunteer General Hospital, and Dr. Urankar under the theory of negligence.[1] After a five day trial, the jury found in favor of Ms. Steele, awarding her $800,000 in damages. Volunteer and Dr. Urankar appeal the verdict, raising the following issues, as we perceive them, for our review:

I.      Did the trial court err in admitting the expert testimony of Dr. Kenneth Carr?

---

[1] Columbia/HCA Health Care Corporation was dismissed without prejudice prior to the trial.

II.     If this Court determines that the trial court erred in admitting the testimony of Dr. Kenneth Carr, should this Court direct a verdict in favor of the defendants by finding that Ms. Steele failed to prove Dr. Urankar violated the standard of acceptable practice in Martin, Tennessee or similar communities or that the alleged delay in giving Mr. Steele tPA caused his death?

Medical malpractice claims are governed by section 29-26-115 of the Tennessee Code. *Moon v. St. Thomas Hosp.*, 983 S.W.2d 225, 229 (Tenn. 1998). According to this section, the plaintiff in a medical malpractice action has the burden of proving the standard of care, the defendant's breach of the standard of care, and causation.[2] *Id.* Normally, expert testimony is required to prove each of these elements. Tenn. Code Ann. § 29-26-115(b) (Supp. 2001); *Moon*, 983 S.W.2d at 229; *White v. Vanderbilt University*, 21 S.W.3d 215, 226 n.11 (Tenn. Ct. App. 1999).

Volunteer's appeal chiefly concerns the testimony of Dr. Carr. In their first issue, Volunteer asserts the trial court erred by admitting, over Volunteer's objection, Dr. Carr's testimony. First, Volunteer contends that the court erred in admitting Dr. Carr's testimony regarding the "standard of acceptable practice for emergency medicine in Martin, Tennessee or a similar community." Second, Volunteer contends that the court erred in admitting Dr. Carr's testimony regarding causation. We will address each of Volunteer's arguments in turn.

Volunteer asserts that Dr. Carr's testimony failed to comply with the law in Tennessee with respect to the requisite standard of care because Dr. Carr "based his testimony on what he would have done if he had been the physician treating plaintiff." Volunteer contends that Dr. Carr did not testify that he was "familiar with the standard of acceptable professional practice in Martin or similar communities" as mandated by section 29-26-115(a)(1) of the Tennessee Code. Indeed, this Court stated in *Jennings v. Case*, 10 S.W.3d 625, 632 (Tenn. Ct. App. 1999), that "[i]t is well settled that the testimony of a physician as to what he would do or his opinion of what should have been done does not prove the standard of care." Testimony by a physician as to what he or she would have done in a particular situation is inadmissible to prove the standard of care because it is "incapable of being disproved by anyone else." *Id.* at 632 n.3.

---

[2]Specifically, section 29-26-115 of the Tennessee Code provides the following:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

    (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

    (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

    (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115 (Supp. 2001).

Before we reach the merits of the issue raised by Volunteer, however, Ms. Steele asserts that Volunteer failed to comply with the Tennessee Rules of Civil Procedure and the Tennessee Rules of Appellate Procedure regarding this issue, and thus, the issue is not properly before this Court. In Volunteer's motion for a new trial, they asserted that the verdict was contrary to the weight of the evidence at trial. Volunteer supplemented this motion with additional grounds for a new trial. In that motion, Volunteer stated the following three grounds:

> (A) the Court incorrectly failed to exclude Dr. Kenneth Carr's testimony regarding the causation of Steele's death. Dr. Carr's testimony on this point was not based on a reasonable degree of medical certainty. It was based on lost chance of survival.

> (B) plaintiff's expert proof was also deficient in the following: (1) neither of plaintiff's experts testified that he was familiar with the acceptable standards of professional practice for physicians practicing emergency medicine in Martin, Tennessee, or in a similar community August 1996; (2) neither of plaintiff's experts stated his causation opinions to a reasonable degree of medical certainty;

> . . . .

> (C) only in the event that the Court should not grant a new trial based on the evidentiary issues raised above, the Court should exercise its role as thirteenth juror, independently weigh the evidence, and order a new trial because the weight of the evidence is contrary to the jury's verdict.

Finally, in Volunteer's memorandum to support their motion for a new trial, regarding part (B) above, Volunteer stated that "[t]he Court should order a new trial in this action because plaintiff failed to present expert medical testimony sufficient to prevail as a matter of law."

It appears in part (B) of Volunteer's supplemental motion that they are challenging the legal sufficiency of Ms. Steele's evidence regarding standard of care and causation, not the admissibility or overall weight of Dr. Carr's testimony. The question of whether evidence is sufficient to support a jury verdict is tested by a motion for a directed verdict, and in order for the trial court to consider the sufficiency of the evidence in a post trial motion, the moving party must have made a motion for a directed verdict at the conclusion of all of the proof. Tenn. R. Civ. P. 50.01 & 50.02; ***Cortez v. Alutech, Inc.***, 941 S.W.2d 891, 894 (Tenn. Ct. App. 1996). Similarly, in order for this Court to review the sufficiency of the evidence on appeal, the motion for a directed verdict must have been made at the conclusion of all of the proof and renewed in a post judgment motion following the jury's verdict. ***Cortez***, 941 S.W.2d at 894; ***See also*** Robert Banks, Jr. & June F. Entman, ***Tennessee Civil Procedure*** §§ 12-1(a) - 12-1(d) (1999) (discussing Rules 50.01 and 50.02 of the Tennessee Rules of Civil Procedure).

In contrast, a motion for a new trial is utilized to correct alleged errors the court made during trial. ***Saffles v. Harvey Motor Co.***, 780 S.W.2d 727, 728 (Tenn. Ct. App. 1989). A motion for a

new trial provides the trial judge the opportunity to "consider or reconsider alleged errors committed during the course of trial or other matters affecting the jury or the verdict." *Cortez*, 941 S.W.2d at 894. Additionally, a motion for a new trial is of significant importance in appellate procedure. Rule 3(e) of the Tennessee Rules of Appellate Procedure states as follows:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

In part (B) of Volunteer's supplement to their motion for a new trial, they are asserting that a new trial is warranted because Ms. Steele's evidence as to the standard of care to be utilized at Volunteer's emergency room and as to whether Dr. Urankar's alleged negligent act caused Mr. Steele's death is insufficient to support the jury's verdict.[3] Volunteer states that Ms. Steele offered no other expert proof on these issues other than the testimony of Dr. Carr and Dr. Walker. If the trial court agreed with Volunteer's post trial motion and determined the expert proof as to these issues proffered by Ms. Steele was insufficient, Volunteer would be entitled to a directed verdict by the trial court. There would not be a need for a new trial. Because Volunteer did not move for a directed verdict at the conclusion of all the proof, they could not effectively move for a directed verdict after learning of the jury's decision by attempting to couch that motion within a motion for a new trial.

It follows that, on appeal, we cannot consider the sufficiency of Ms. Steele's evidence regarding the standard of care if no motion for a directed verdict was made by Volunteer at the conclusion of the proof. Further, we cannot address the ***admissibility*** of Ms. Steele's evidence regarding the applicable standard of care. In Volunteer's motion for a new trial, they failed to assert error in the trial judge's admission of Dr. Carr's expert testimony regarding the standard of care. As this case is before this Court as the result of a jury trial, Rule 3(e) of the Tennessee Rules of Appellate procedure applies. Because the motion for a new trial does not raise the issue of the admissibility of Dr. Carr's testimony concerning standard of care, we cannot consider it on appeal. The motion for a new trial is only concerned with the ***sufficiency*** of Ms. Steele's standard of care evidence, which must first be tested in a motion for a directed verdict. Accordingly, Volunteer's concerns regarding Dr. Carr's testimony on the applicable standard of care are not properly before this Court and are, pursuant to Rule 3(e) of the Tennessee Rules of Appellate Procedure, waived.

---

[3]The fact that Volunteer took issue with the trial judge's ***admission*** of the causation testimony in part (A) of the supplemented motion, and then questioned the ***sufficiency*** of the causation testimony in part (B) of the motion, is illustrative of Volunteer's desire to have the trial court and this Court on appeal examine the sufficiency of Ms. Steele's evidence regarding the applicable standard of care. Volunteer's only argument regarding the standard of care was in part (B) of the supplemented motion.

Even if we were to consider whether Dr. Carr's testimony should have been admitted by the trial court to establish the standard of care in this case, Volunteer's argument would fail. On the direct examination of Dr. Carr, he offered the following testimony:

> Q. Dr. Carr, I'm going to ask you that question again. I want you to tell us what your opinion is, your medical opinion, given Mr. Steele's symptoms, his age, and that electrocardiogram, what, if anything, did the accepted standard of medical professional practice in Martin, Tennessee, and similar communities require Dr. Urankar to do for him when she sees that EKG?

> A. This is not a situation with which I am unfamiliar. Let me remind you that I am an emergency room physician and have worked many high-volume emergency rooms. This is not something foreign to me. But if I were the emergency room physician - -

> Mr. Pinckney: Objection.

The trial court excused the jury while Mr. Pinckney presented his objection.

> Mr. Pinckney: Yes, sir. The witness has never said that he knows what the standard of acceptable professional practice is. The question, as was phrased, already implies that he knows what it is. But, more importantly, when the witness answers the question, he tells what he knows, what he does, what he would do, and that's inappropriate, because the standard, as you know, is the standard of acceptable professional practice in this community and in similar communities.

Thereafter, Mr. Emison rephrased his question and Dr. Carr answered as follows:

> If I didn't take the action I'm proposing, whether I were in Millington, Fort Campbell, Lourdes Paducah, Jackson hospitals, I would be fired. I wouldn't have a job. I don't know how to defend not giving this patient tPA. My mind doesn't go there. I do not know how, with this 14:16 tracing in twenty seconds, I wouldn't have ordered tPA by 14:17. I don't know any other emergency room physicians who would not have done that. A forty-nine-year-old male in a drenching sweat, pressing retrostrernal chest pain, and this EKG, that's the end of the story. tPA, he gets.

The court overruled the objection and allowed the jury to return to the courtroom. Mr. Emison asked the question again to Mr. Carr and the following transpired:

> A. Well, it isn't any different whether I work in Martin, or Jackson, Dyersburg, Memphis, Fort Campbell, Paducah. A forty-nine-year-old male with pressing retrostrernal chest pain, with a drenching sweat, comes to an emergency room with this EKG, he gets tPA, and that's the end of the story.

Q. Dr. Carr, was he given tPA?

A. No.

Q. Dr. Carr, when would the accepted standard of medical practice require him to get that tPA after the EKG?

A. You want it as soon as possible. We try to do that within two hours. It is effective up to six hours, perhaps. Beyond six hours, somewhat of a gray zone. Beyond twelve hours, it's too late, is what most people believe. But the bottom line is that as soon as the clinical presentation and this EKG are done, there are no more entertained diagnoses, there is no time to send the patient down the hallway for a half an hour or an hour of x-rays, there is no time to have blood drawn, and the labs and tests run. A forty-nine-year-old male, acute chest pain, drenching sweat, and inferior infarction, if this is 14:16 and 20 seconds, in the time it takes you to, say, give tPA by protocol, that's what that process has been in place since I've been in Martin and we've had tPA.

We find no error in the trial court's admission of the above testimony. When Dr. Carr stated that "it isn't any different whether I work in Martin, or Jackson, Dyersburg, Memphis, Fort Campbell, Paducah," he was not testifying to what he personally would have done. Further, we find the following testimony by Dr. Carr illustrative of his knowledge of the applicable standard of care:

A forty-nine-year-old male, acute chest pain, drenching sweat, and inferior infarction, if this is 14:16 and 20 seconds, in the time it takes you to, say, give tPA by protocol, that's what that process has been in place since I've been in Martin and we've had tPA.

The above testimony illustrates that Dr. Carr is familiar with the standard of acceptable medical practice in Martin and similar communities as required by section 29-26-115(a)(1) of the Tennessee Code. Additionally, Dr. Carr adequately described the standard when he stated that a patient with the symptoms and an EKG similar to Mr. Steele's should get tPA as soon as possible. This is evidence of the standard of care to be utilized in Martin and similar communities. Accordingly, the trial court did not err in admitting Dr. Carr's testimony regarding the standard of acceptable medical practice in Martin and in similar communities.

Volunteer's second argument regarding Dr. Carr's testimony concerns causation. Volunteer contends that Dr. Carr failed to testify within a reasonable degree of medical certainty that Dr. Urankar's negligence caused the death of Mr. Steele. Specifically, Volunteer argues that, considering Dr. Carr's testimony in its entirety, Dr. Carr only testified that Mr. Steele lost an opportunity to survive and nothing more.

In *Kilpatrick v. Bryant*, 868 S.W.2d 594,602 (Tenn. 1993), the supreme court stated that "proof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient, as a matter of law to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case." Additionally, the court stated that "[c]ausation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty." *Id.* (citing *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)). Accordingly, the court stated that in Tennessee, a plaintiff must prove that the physician's negligence more likely than not was the cause in fact of the injury. *Id.* This requirement mandates that a plaintiff must have had a greater than fifty percent chance of recovering absent the physician's negligence. *Id.*; *see also Volz v. Ledes*, 895 S.W.2d 677, 679 (Tenn. 1995).

In the present case, it follows that Ms. Steele had the burden to prove that Dr. Urankar's failure to timely administer tPA to Mr. Steele more probably than not caused Mr. Steele's death. On direct examination, Dr. Carr testified as follows:

> Q. Dr. Carr, do you have an opinion that if Mr. Steele had received the tPA, whether it is more likely than not he would have lived?
>
> A. Yes.
>
> Q. What is that opinion?
>
> A. That he would have done better. That the complications that came are complications we see from myocardial infarctions, and that those – the reason – the whole reason we're using tPA and the reason we're getting people to emergency rooms as promptly as we are these days is to prevent catastrophes from this type of insult.
>
> Q. Do you have a medical opinion about whether it would have been more likely than not he would have lived?
>
> A. Yes.
>
> Q. What is that?
>
> A. That he would have done better.
>
> Q. Do you think he would have lived?
>
> A. Yes, I think so.

The preceding was the extent of Dr. Carr's testimony regarding causation on direct examination. The cross examination of Dr. Carr was, as both parties candidly admit, rather heated. (Oral argument). At the outset, Volunteer questioned Dr. Carr about his deposition testimony where Dr. Carr stated that Mr. Steele had "a far better chance of [living]" had he received tPA at 2:17 p.m. In the same deposition, after Volunteer asked Dr. Carr whether Mr. Steele would have lived, Dr. Carr replied, "I'm not God, and I don't know whether he would have lived or not, but he was deprived of the opportunity to live." Volunteer asked Dr. Carr to explain the deposition testimony. Dr. Carr responded, "[a] lost opportunity, more likely to survive. It's the same. He lost his opportunity . . . to survive. You see those as very different things. I see them as the same." Mr. Pinckney immediately objected to this testimony, stating that it was not acceptable under Tennessee law. Further, Mr. Pinckney requested that the court find Dr. Carr incompetent to render an opinion regarding causation. The court agreed that the testimony did not comply with the law regarding causation in Tennessee. The court, however, overruled the objection as to the overall ability of Dr. Carr to testify regarding causation, citing a desire to hear the testimony as a whole. The court stated that it would consider the testimony again at its conclusion.

The remainder of Mr. Pinckney's cross examination of Dr. Carr as to causation involved Mr. Pinckney's efforts to elicit testimony from Dr. Carr regarding the inconsistencies in Dr. Carr's deposition and trial testimony. The record provides the following excerpt:

> Q. So, you don't know whether he would have lived or not, to a reasonable degree of medical certainty, do you, sir?
>
> A. That's where the words come in. I think he would have lived. I think this man was salvageable. Yes, I do, Mr. Pinckney, think he was a life that could have been saved with the technology we had in 1996. Because of the manner in which he was treated, that did not happen.
>
> Q. Why didn't you tell me that when I took your deposition, sir, when I asked you the question, "Would he have lived, Dr. Carr." And you told me, "I'm not God, and I don't know whether he would have lived or not[.]"?
>
> A. . . . . That deposition must have gone on for three hours. And toward the end of it, maybe I wasn't on my best of behaviors and best of answerings. But, to me, this is a very cut-and-dried case, Mr. Pinckney, in which I don't think Mr. Steele got acceptable care in Weakley County, or any other county. And if he had had [sic] it, I do believe he would still be alive and helping his family today.

Thereafter, the court, in response to another objection regarding the causation testimony of Dr. Carr, stated that the testimony was "responsive" and that "the point has been well made to the jury, and the jury understands the inconsistencies in the testimony." The court again noted Mr. Pinckney's objection regarding causation and took no further action on the matter.

From our review of the record, in addition to the testimony detailed above, we find no error in the trial court's decision to admit Dr. Carr's testimony regarding the cause of Mr. Steele's death. Dr. Carr established that Mr. Steele would have lived had Dr. Urankar followed the acceptable standard of medical care in Martin and similar communities. The testimony was far from ideal, and Dr. Carr's stated concern of attorneys being "experts in words" and "wordsmiths" affected the tone and substance of his testimony on cross examination. Nevertheless, Dr. Carr's testimony had the certainty required in order for a jury to determine that Dr. Urankar's negligence caused Mr. Steele's death. Dr. Carr's overall testimony adequately demonstrated, more likely than not, that Dr. Urankar caused Mr. Steele's death by failing to timely administer tPA.

Accordingly, we affirm the decision of the trial court. Costs of this appeal are taxed to Hospital Corporation of Tennessee, d/b/a Columbia Volunteer General Hospital, Dr. Nancy Urankar, and their sureties, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE